In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-1286

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAJUAN FITZPATRICK,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 16-cr-00166 — **Phillip P. Simon**, *Judge.*

———————————

ARGUED JANUARY 12, 2022 — DECIDED APRIL 27, 2022

———————————

Before FLAUM, EASTERBROOK, and WOOD, *Circuit Judges*.

FLAUM, *Circuit Judge*. After a home invasion robbery went violently awry, a jury convicted Lajuan Fitzpatrick of two crimes: (1) conspiring to possess with the intent to distribute a controlled substance and (2) murder resulting from the use and carrying of a firearm during and in relation to a drug trafficking crime. On appeal, Fitzpatrick challenges the sufficiency of the evidence underpinning his convictions and the

reasonableness of his sentence. For the following reasons, we affirm Fitzpatrick's conviction and sentence.

## I.    Background

### A.  Summary of Events and Indictment

As presented through testimony at trial, after Robert Nieto (known as Cowboy), a leader of the Black Oak Latin Kings gang in Gary, Indiana, learned that a local drug dealer, Anthony Martinez, had "some pounds" of marijuana at his home, he devised a plan to rob Martinez's home. Leading up to the deadly encounter at the center of this case, Nieto recruited Bruce Hendry (known as Casper), another Latin Kings gang member, and Hendry then reached out to Mark Cherry, a former member of the Black P. Stone gang, who also agreed to participate. Cherry in turn looped his roommate, Fitzpatrick, into the scheme. Fitzpatrick was also a member of the Black P. Stones, a gang known to be non-adversarial (at least to some degree) with the Latin Kings.

On or about December 1, 2013, Cherry told Fitzpatrick that Hendry "had a lick"—also known as a "sting" or a robbery. Cherry then picked up an assault rifle and a handgun from the home he shared with Fitzpatrick. Cherry informed Fitzpatrick they needed the guns for the robbery and told Fitzpatrick there were drugs—specifically marijuana—in the target house. Hendry, Cherry, and Fitzpatrick drove together to Nieto's house. While Fitzpatrick stayed in the car, Hendry and Cherry went in to talk with Nieto about their plans. Nieto told them that it would be an "easy" robbery to score "a couple pounds" of marijuana. The three men—Nieto, Cherry, and Hendry—planned to smoke some of the marijuana and

resell the rest. Hendry and Cherry planned to carry out the robbery while Nieto listened on the police scanner.

Shortly thereafter—sometime around midnight—the crew put the plan into action. Cherry and Hendry rejoined Fitzpatrick before the trio switched cars and were driven a short, approximately two-minute distance to the intended robbery location by a fourth person. They exited the car upon arriving at Martinez's home—carrying firearms and obscuring their faces with masks and black hoodies.

Martinez, the target of this drug-focused robbery, estimated that he was selling roughly "[a] couple hundred bucks, if that," worth of marijuana per month at the time of the incident. That night, Martinez was watching television with his fiancée and two friends when he heard a knock on his front door. Suspicious because that door was not normally used, Martinez walked out the back door to investigate and was promptly hit in the head with a pistol as he turned the corner to the front of his house. Martinez's assailant then "threw [his] sweater over [his] face and walked [Martinez] through the back door" into his home. Once inside, one of his attackers— later identified as Cherry—repeatedly asked where the marijuana was kept. Martinez indicated that at the time of the home invasion there was "[z]ero marijuana" in the home.

Martinez's brother, who lived next door, entered the kitchen, and a fight ensued. The brothers eventually subdued the assailants, but not before Martinez shot Cherry at least twice in the abdomen. After hearing "rapid fire" shots aimed at the house, the brothers took cover in the kitchen, using the refrigerator as a shield. The scene around the house was described as a "war zone" amid copious amounts of gunfire. In the chaos, an uninvolved friend of the Martinez brothers was

fatally shot by the ongoing gunfire while his toddler-aged daughter looked on.

After sustaining serious gunshot wounds, Cherry was dragged from the home into the car in which he arrived, all while Fitzpatrick continued to spray fire from the street. After getting Cherry into the car, the group of robbers drove less than a block to Nieto's house, where a nearby police officer arrested Cherry and the driver. Hendry and Fitzpatrick ran. After fleeing to a friend's house, attempting to clean himself up with bleach, and telling a Latin King gang member present that he "just laid a [expletive] down," Fitzpatrick placed his bloody clothes into a steel drum and set them on fire.

The grand jury returned a two-count indictment against Fitzpatrick, charging him with (1) conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and (2) carrying, using, and discharging a firearm in relation to a drug trafficking crime resulting in killing defined as murder, in violation of 18 U.S.C. §§ 924(c)(1)(A), (j). Fitzpatrick denied committing these offenses and pleaded not guilty.

## B. Trial, Post-Trial Motions, and Sentencing

After the government rested its case, Fitzpatrick made a motion for acquittal. He renewed his motion for a directed finding of acquittal once jury deliberations were underway. The court promptly denied both oral motions. The jury convicted Fitzpatrick on both counts. Fitzpatrick filed a written post-trial motion for judgment of acquittal and motion for new trial, both of which were denied.

The district court proceeded to sentence Fitzpatrick. Looking to Fitzpatrick's presentence investigation report ("PSR"),

his base offense level was 43 and his criminal history category was III. For Count 1, the probation office recommended one day of imprisonment. For Count 2, the statutory provision was ten years to life, the Guideline provision was life, and the recommended sentence was 240 months' imprisonment. In reaching its below-Guidelines recommendation, the probation office noted significant mitigating factors in the PSR, including the details of a challenging childhood, a severe learning disability (Fitzpatrick could not read or write), and bullying.

The district court adopted the PSR's Guidelines calculations. Defense counsel requested a 240-month (twenty-year) sentence, aligning with the probation office's recommendation. The defense pointed to Hendry's 360-month (thirty-year) sentence as an unequal comparator, given that Hendry's role in organizing the crime was much more significant and that Fitzpatrick's minimal criminal history paled in comparison to Hendry's long history of gang-related criminal activity. The government asked for a life sentence.

The court sentenced Fitzpatrick to 432 months (thirty-six years) of imprisonment on Count 2 and one day on Count 1, to run concurrently, as well as three years of supervised release. Leading up to this sentence, the district court acknowledged the extreme difficulties faced by Fitzpatrick growing up, noting, "[i]t really takes my breath away this environment in which you were raised."

In paying special attention to the need to avoid unwarranted sentencing disparities among similarly situated defendants, the district judge acknowledged that he was "troubled" that "the co-defendants in this case have received a variety of sentences." The court found Nieto, who received a life

sentence, more culpable than Fitzpatrick, given his role as ringleader of this crime and history of extensive gang-related criminal activity. Hendry's sentence of thirty years was a notable discussion point for the court. The district judge stated:

> Hendry received a sentence of 30 years. I wasn't born yesterday. I understand the circumstances. I mean, the government cut a deal with him. You had a bird in the hand. Even though he sent them on, sort of, a wild goose chase here that ended up requiring the government—they actually charged somebody and then had to backtrack because they no longer could believe Mr. Hendry…. The government could have moved to withdraw his plea agreement because he was violating its terms.

> The government decided instead to simply put it in Judge Moody's capable hands and let him decide what the appropriate sentence would be for him. And he gave him the maximum that he could have given him under the terms of the plea agreement, which was 30 years. It's worth noting that Mr. Hendry had substantially more criminal history than Mr. Fitzpatrick did, and so, you know, that fact is not lost on me either.

The district court went on to dismiss any comparison to Cherry or Landrum as not compelling. Cherry, who received 188 months (over fifteen years), "cooperated, testified, [and] put himself at risk," making his sentence "entirely defensible." Landrum, the driver of the car, "played a really passing role in this case, literally driving these guys, like, around the

block." Even so, he received a 168-month (fourteen-year) sentence.

Finally, when choosing Fitzpatrick's sentence, the district court emphasized the "extreme" and "frightening" level of violence that Fitzpatrick engaged in, acting like he was "in some war movie where you're firing protective shots to keep your cohorts safe." The district court also factored in the death of the "terrific young man" and "good father" caused by this crime. The district court concluded that a 432-month (thirty-six-year) sentence of incarceration was "sufficient but not greater than necessary to achieve all of the statutory goals of sentencing."

Fitzpatrick now appeals.

## II.    Discussion

On appeal, Fitzpatrick raises two challenges. He argues the government failed to present evidence sufficient to support his conviction; in the alternative, he challenges his sentence as substantively unreasonable. We address each argument in turn.

### A.  Challenge to Sufficiency of the Evidence

Fitzpatrick first challenges the sufficiency of the evidence supporting his conviction on Count 1, which charged Fitzpatrick with joining a conspiracy to possess with intent to distribute marijuana. Notably, proof of guilt on Count 1 was, itself, an element of Count 2. Because he stayed in the car while the others discussed the plan, Fitzpatrick argues that "there was no evidence whatsoever presented at trial that [he] was aware of any plan, or joined any agreement, to resell marijuana that was apparently the object of the robbery."

"De novo review applies to the denial of a motion for judgment of acquittal; practically speaking, however, the standard of review is that for sufficiency of the evidence." *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016). "In a sufficiency-of-the-evidence challenge after a jury verdict, we review the evidence presented at trial in the light most favorable to the government and draw all reasonable inferences in its favor." *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021). "We will overturn a conviction only if, after reviewing the record in this light, we determine that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Id.* This burden is a high one—one we have described as "nearly insurmountable." *Id.* (quoting *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018)).

Turning to the essential elements for Count 1, "[a] conspiracy requires a showing that (1) two or more people entered into an agreement to distribute drugs, and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Pulgar*, 789 F.3d 807, 813 (7th Cir. 2015). For this offense, the government must prove that the co-conspirators had the joint criminal objective of distributing drugs. *United States v. Colon*, 549 F.3d 565, 569–70 (7th Cir. 2008). Nonetheless, as long as a defendant "knew the essential nature and scope of the charged conspiracy," he "need not [have] join[ed] a conspiracy at its inception or participate[d] in all of the unlawful acts in furtherance of the conspiracy to be convicted." *United States v. Orlando*, 819 F.3d 1016, 1022 (7th Cir. 2016).

The government may rely on circumstantial evidence to prove these elements, but "the Supreme Court has warned that '[i]n some cases reliance on [circumstantial] evidence perhaps has tended to obscure the basic fact that the *agreement* is

the essential evil at which the crime of conspiracy is directed.'" *United States v. Cruse*, 805 F.3d 795, 811 (7th Cir. 2015) (alterations in original) (quoting *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975)). Circumstantial or not, "[w]hether the evidence establishes a conspiratorial agreement must ultimately be determined by the totality of the circumstances, and we conduct a 'holistic assessment of whether the jury reached a reasonable verdict.'" *Id.* (quoting *United States v. Brown*, 726 F.3d 993, 1002 (7th Cir. 2013)).

In summary, Fitzpatrick contends that "the government fell far short of" introducing substantial evidence that he (1) knew of the illegal objective of the conspiracy (here, drug distribution) and (2) that he agreed to participate, as necessary to convict him on Count 1. *See United States v. Corson*, 579 F.3d 804, 810 (7th Cir. 2009). The district court explained its rejection of this argument in a written opinion after the jury handed down its verdict:

> In reviewing the evidence, a reasonable jury could find that Fitzpatrick was part of a plot to steal and later distribute marijuana. Cherry explained to Fitzpatrick that the robbery involved stealing marijuana from a known drug dealer, consuming a portion of it, and selling the rest. Cherry intended to share his portion of the proceeds with Fitzpatrick. Fitzpatrick went with Cherry to the drug dealer's house and was given an assault rifle. After being involved in a shoot out and loading his friend who had been shot into the car, he showed up at a friend's house with blood on him…. This is sufficient evidence for a reasonable jury to find that

> Fitzpatrick was involved in the conspiracy to rob a drug dealer with intent to possess and later distribute marijuana, as charged in Count 1.

Fitzpatrick claims the court's recollection of the testimony was incorrect; specifically, he contends that there was no direct evidence that Fitzpatrick was told the home invasion robbery was, at least in part, for the resale of the drugs. But even if the record does not directly demonstrate Fitzpatrick was privy to the discussion on plans to resell, Seventh Circuit precedent establishes the appropriate role of circumstantial evidence in establishing intent to distribute.

In *United States v. Lewis*, 641 F.3d 773 (7th Cir. 2011), the defendants were convicted of conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846 and carrying and possessing a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). *Id.* at 776. In that case, defendants planned an armed robbery of a cocaine stash house, intending to surprise the occupants, tie them up, steal the drugs and weapons, and later sell the drugs. *Id.* at 777–78. The stash house, however, turned out to be a fictitious part of an undercover police investigation. *Id.* at 777. Like Fitzpatrick, one of the defendants in *Lewis* argued on appeal that "although he may have been part of a conspiracy, this was just a conspiracy to rob a stash house for drugs, and there was no evidence of his intent to distribute or knowledge that his co-conspirators were intending to distribute." *Id.* at 782. We rejected that argument in *Lewis*, concluding that "[a] jury could reasonably believe that [defendant] … was aware that such a large amount of [drugs] was optimal

for distribution." *Id.* Even more convincingly, the Court reasoned:

> A jury could equally reasonably believe that no sane person would rob a stash house guarded by armed gang members to score some recreational drugs for personal use. For a jury to reach such a conclusion hardly requires the impermissible piling of inference upon inference, but rather is the sort of rational result from circumstantial evidence we ask juries to determine every day.

*Id.*

The same logic applies in this case. It was reasonable for the jury to find it unlikely that Fitzpatrick or his co-conspirators would have endeavored to carry out this dangerous operation requiring armament if the reward was merely marijuana for recreational use. *See Lewis*, 641 F.3d at 782; *see also United States v. Garrett*, 903 F.2d 1105, 1113 & n.11 (7th Cir. 1990) (holding presence of weapons may point in the direction of distribution).

Even factoring in any learning disability, Fitzpatrick was savvy enough to provide coverage fire while his co-conspirator was being pulled out of the house, to avoid capture at Nieto's, and to wash off and burn away traces of the crime. Nothing on the record precludes the jury from reasonably concluding Fitzpatrick was capable of understanding that the goal of the robbery was at least, in part, to acquire drugs for resale as opposed to purely recreational use. From our standpoint on review, proving that no jury could reasonably believe Fitzpatrick could make this connection is a formidable

hurdle. *See United States v. Kindle*, 698 F.3d 401, 405 (7th Cir. 2012), *vacated on other grounds on reh'g en banc sub nom. United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014). "Overturning a guilty verdict for lack of evidence is serious business; we are essentially asked to take the case out of the jury's hands, something we will do only if the record contains no evidence, *regardless of how it is weighed*, from which the jury could find guilt beyond a reasonable doubt." *Id.* at 406 (citation and internal quotation marks omitted). With this in mind, we see no evidentiary deficiency. There is evidence, namely the fact that Fitzpatrick armed himself with an assault rifle to steal drugs, that the jury could have relied on to find guilt beyond a reasonable doubt. Thus, we affirm Fitzpatrick's conviction.

## B. Challenge to Reasonableness of the Sentence

Fitzpatrick next challenges his thirty-six-year sentence as unreasonably high. "In reviewing sentences for substantive reasonableness, we do not substitute our judgment for that of a district judge, who is better situated to make individualized sentencing decisions." *United States v. Porraz*, 943 F.3d 1099, 1104 (7th Cir. 2019). We review a sentence's reasonableness for abuse of discretion, and we will "uphold a sentence so long as the judge offers an adequate statement of his reasons consistent with the sentencing factors enumerated in 18 U.S.C. § 3553(a)." *Id.* Sentences within a properly calculated Sentencing Guidelines range are presumptively—although not conclusively—reasonable. *United States v. Boscarino*, 437 F.3d 634, 637 (7th Cir. 2006). This presumption of reasonableness also extends to below-Guidelines sentences. *United States v. Harris*, 791 F.3d 772, 782 (7th Cir. 2015).

As Fitzpatrick acknowledges in his brief, "the district court's sentence was technically below the guidelines 'range'

of life imprisonment," so we begin our analysis from a pre-sumption of reasonableness. *See id.* The first argument Fitz-patrick raises is that his 432-month term of incarceration is an "effective life sentence." Fitzpatrick was twenty-nine years old when sentenced, and his life expectancy of 64.5 years, as calculated in part by his age and race, is less than his projected age upon release (after thirty-six years' incarceration, Fitzpat-rick would be sixty-five). Fitzpatrick notes that this sentence will "all but ensure[] that [he] will spend the remainder of his life incarcerated."

Fitzpatrick cites to *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006), for the proposition that "the probability that a convict will not live out his sentence should certainly give pause to a sentencing court." *Wurzinger*, however, is fac-tually distinguishable from the case before us. In taking a close look at *Wurzinger* and the cases it relies on, the above-cited rationale applies specifically to defendants who pre-sented evidence at sentencing about extenuating medical con-ditions, rather than to defendants grappling with life expec-tancy calculations more generally. *See id.* at 651–52 (discuss-ing the impact of diabetes on life expectancy); *United States v. Gigante*, 989 F. Supp. 436, 442 (E.D.N.Y. 1998) (employing life expectancy predictions in the context of defendant's history of cardiac surgery).

Although not mentioned by either party, *United States v. Patrick*, 707 F.3d 815, 820 (7th Cir. 2013), is instructive:

> Most worrisome is our inability to discern whether the court appreciated the severity of the sentence it imposed, and in particular its equivalence to the life sentence that it had pur-portedly rejected. Perhaps a 360-month

> sentence concurrent to [defendant's] 20-year
> state sentence would not have been problem-
> atic, but a 360-month consecutive sentence in
> [defendant's] case *is* effectively a life sentence.
> [Defendant's] sentence runs until he is 86, and
> the average life expectancy for a male of [his]
> age and race is approximately 72 years.

We have, however, subsequently stated that "*Patrick* does not stand for the proposition that, every time a district court imposes a sentence that exceeds the defendant's life expectancy, the court must explicitly recognize that fact." *United States v. Cheek*, 740 F.3d 440, 454 (7th Cir. 2014). If the district court never states that it wishes to give a defendant something less than a life sentence, the court's failure to explicitly address life expectancy concerns is less problematic. *See id.* ("And *Patrick* is distinguishable from [this] case because here the district court never stated that he wished to give [defendant] something less than a life sentence.").

Although the parties went back and forth at sentencing about the appropriateness of a life sentence here, the district court did not explicitly articulate a wish to give Fitzpatrick something less than a life sentence. First, in talking about Fitzpatrick, the district court stated:

> I don't believe you [Fitzpatrick] were the organ-
> izer. I don't believe you at all played that role.
> Of course, the guidelines don't reflect that, but
> it's certainly worth pointing out. It does seem
> like you were kind of an add-on person into this
> scheme, but you did what you did, and it's ex-
> tremely violent and very disturbing.

Next, in talking about Nieto (who received a life sentence), the district court stated:

> Mr. Nieto received a life sentence, but this homicide, for which he was held accountable, because he was kind of the ring leader who put this together, was really just one of many, many, many things that Mr. Nieto did in his role as a leader of the Latin Kings.

Even if what we glean from the sentencing transcript hints at an intent by the district court to give less than a life sentence, Fitzpatrick's sentence is nevertheless reasonable for two reasons. First, Fitzpatrick's projected release date as calculated by the Federal Bureau of Prisons—July 30, 2048—comes just shy of his 57th birthday. *See Find an Inmate*, Fed. Bureau of Prisons, www.bop.gov/inmateloc (last visited April 12, 2022) (search for "Lajuan Fitzpatrick"). Although a slight variation from the calculations relied on in *Cheek* and *Patrick*, the projected release date calculations at play here assuage concerns "that the sentence amounted to a *de facto* life sentence." *Cheek*, 740 F.3d at 454. Practically speaking, this sentence is not in excess of the projected life expectancy raised on appeal. Second, "even if we assume that [Fitzpatrick's] sentence is effectively a life sentence, the district court adequately explained his sentence in a manner consistent with the § 3553(a) factors, which is all that was required." *United States v. McDonald*, 981 F.3d 579, 581–82 (7th Cir. 2020). "[W]e have upheld a de facto life sentence where the sentencing court determined that the defendant showed a risk of recidivism and lack of respect for the law and the court appreciated the severity of the sentence." *Id.* (citation and internal quotation

marks omitted). For either of these reasons, the district court did not abuse its discretion in sentencing.

The second argument Fitzpatrick raises under the umbrella of sentence reasonableness is that his sentence was unreasonable considering his co-conspirators' sentences. The Sentencing Reform Act requires a judge to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Notably, "a sentencing *difference* is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation." *Boscarino*, 437 F.3d at 637–38. Here, Hendry cooperated and cut a deal (although the government certainly could have revoked it), and Cherry cooperated. Those qualify as reasonable sentencing differences based on rewards for cooperation. Fitzpatrick also argues that his *de facto* life sentence was unreasonable because it was effectively the same as Nieto's, yet Nieto had a far worse criminal history. Nieto, however, received a real life sentence, not a *de facto* one. And the record is far from clear that Fitzpatrick would never leave prison, as we can see from his projected release date. …There was thus no unwarranted sentencing disparity between the two.

We uphold a sentence so long as the judge offers an adequate statement of his reasons consistent with the sentencing factors enumerated in 18 U.S.C. § 3553(a). In this instance, we hold the district judge fulfilled that duty and accordingly affirm Fitzpatrick's sentence.

### III.   Conclusion

For these reasons, we AFFIRM Fitzpatrick's conviction and sentence.