In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1191
UNITED STATES OF AMERICA,
 Plaintiff-Appellee,
 v.

CRAIG KLUND,
 Defendant-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Western District of Wisconsin.
 No. 3:20-cr-00140-JDP-1 — James D. Peterson, Chief Judge.
 ____________________

 ARGUED OCTOBER 27, 2022 — DECIDED FEBRUARY 7, 2023
 ____________________

 Before EASTERBROOK, RIPPLE, and WOOD, Circuit Judges.
 WOOD, Circuit Judge. Craig Klund is a serial fraudster who
specializes in deceiving the U.S. Department of Defense. His
modus operandi is to obtain contracts with the Department
based on false representations, and then to fail to deliver the
promised goods. In this case, he pleaded guilty to wire fraud,
aggravated identity theft, and money laundering, and the dis-
trict court sentenced him to 120 months’ imprisonment. On
appeal, Klund challenges his sentence, arguing that the
2 No. 22-1191

district court improperly calculated the loss he intended to in-
ﬂict. Finding no reversible error, we aﬃrm.
 I
 Klund purports to be a supplier of electrical parts, and
sometimes he actually carries through with a contract. The
present case, however, was not his ﬁrst eﬀort to defraud the
U.S. government. In 1991 and then again in 1993, he was con-
victed for fraudulent misrepresentations involving defense
contracts. His system during that earlier round began with the
submission of false documents to defense agencies. The doc-
uments showed shipments of materials under various con-
tracts; and Klund would then request payment for the goods.
The only problem was that the items had been neither manu-
factured nor shipped. Similarly, Klund solicited and received
progress payments intended for subcontractors, but he pock-
eted most of the money, inﬂicting a loss on the government in
the hundreds of thousands of dollars. He was sentenced to 59
months in prison and was released in 1996. Based on those
convictions, the Department put him on its Excluded Parties
List and disqualiﬁed him from the award of government con-
tracts.
 Undeterred, Klund decided to defraud the government
once more. From 2011 to 2019, he bid on defense contracts us-
ing 15 shell corporations, aliases, and the names of employees
and relatives. Appropriating the identities of two women, he
certiﬁed on the government’s database that one of his shell
companies, Rogue Applied Sciences Corporation, was a
woman-owned business and thus eligible for special consid-
eration. In total, Klund bid on 5,760 defense contracts, and the
relevant agencies awarded 1,928 contracts worth $7.4 million
to eight of his shell entities.
No. 22-1191 3

 Through these shell entities, including Rogue, Klund sat-
isfactorily performed a portion of his contracts; the Depart-
ment paid $2.9 million for these goods. But he knowingly
shipped and requested payment for 2,816 nonconforming
electrical parts. Under the Department’s zero-defect policy,
defense agencies are not permitted to pay an invoice until
they verify that the products conform to the contract speciﬁ-
cations. Klund’s repeated failures to comply with contract re-
quirements prompted the Department (once again) to debar
four Klund aliases and shell entities in 2015. And Klund did
not always partially perform his contracts; he also submitted
invoices to the Department for parts that he had not shipped,
just as he had done in the 1990s.
 When the government discovered his scheme, Klund still
had several outstanding contracts to fulﬁll. In 2021, he
pleaded guilty to one count of wire fraud, one count of aggra-
vated identity theft, and one count of money laundering. Be-
cause these are oﬀenses involving fraud, his advisory sentenc-
ing guideline oﬀense level had to be increased based on the
amount of the loss. See U.S.S.G. § 2B1.1(b). The upward ad-
justment is a function of the greater of actual loss or intended
loss. Id. § 2B1.1 cmt. n.3(A). In addition, the loss amount must
be reduced by “the fair market value of the property returned
and the services rendered … to the victim before the oﬀense
was detected.” Id. § 2B1.1 cmt. n.3(E)(i).
 Before the sentencing hearing, the Probation Oﬃce pre-
pared its customary Presentencing Report, which included
the writer’s loss computations. According to the PSR, the ac-
tual loss ﬂowing from Klund’s oﬀenses came to $2.9 million,
representing the amount that the Department actually paid
4 No. 22-1191

Klund for conforming parts he delivered. The PSR calculated
the intended loss at $5.7 million on the following basis:
 • The proﬁt on the contracts performed by non-
 Rogue shell entities. Since loss must exclude the
 “fair market value of the property returned and the
 services rendered,” the PSR oﬀset the cost of the
 goods that non-Rogue entities delivered from the
 price of those contracts. (Although the cover cost
 would have been a more appropriate measure of
 “the fair market value of property” than proﬁt is,
 the parties did not raise this argument before the
 district court and so we do not explore the point
 further.)
 • The bid price of the non-performed contracts
 awarded to non-Rogue entities. The PSR did not de-
 duct the cost of the non-delivered goods under the
 outstanding contracts, ﬁnding irrelevant Klund’s
 alleged plan to ship them had he not been caught.
 • The bid price of the contracts awarded to Rogue. As
 before, the PSR did not deduct the cost of the goods
 listed in non-performed Rogue contracts. It also de-
 clined to deduct the cost of the goods Rogue did de-
 liver, because the guidelines do not permit credit
 for items provided under contracts involving gov-
 ernment beneﬁts or where regulatory approval is
 obtained by fraud. See id. § 2B1.1 cmt. n.3(F). Since
 Klund fraudulently obtained contracts intended for
 woman-owned businesses, the PSR reasoned that
 no oﬀset should apply.
No. 22-1191 5

 Klund objected to the PSR’s intended loss amount only on
the basis that he should have received credit for the cost of the
parts Rogue delivered. At the sentencing hearing, the district
court denied Klund’s objection and adopted the loss calcula-
tion presented in the PSR. Given that the intended loss ($5.7
million) was greater than the actual loss ($2.9 million), the
court used $5.7 million as the applicable loss amount. This led
to an 18-level increase in Klund’s offense level because the
loss was more than $3,500,000 but not more than $9,500,000,
id. § 2B1.1(b)(1)(J). With this and other adjustments not chal-
lenged here, for purposes of Counts 3 (wire fraud) and 18
(money laundering) Klund had an offense level of 28 and a
criminal history of II, for an advisory range of 87 to 108
months. For Count 15 (aggravated identity theft), he faced a
mandatory consecutive sentence of 24 months. The court im-
posed concurrent sentences of 96 months’ imprisonment for
Counts 3 and 18, and the consecutive sentence of 24 months
on Count 15, for a total sentence of 120 months.
 II
 “We review de novo the district court’s deﬁnition of loss,
the method it uses to measure the loss, and the sentencing
procedure.” United States v. Yihao Pu, 814 F.3d 818, 823 (7th
Cir. 2016) (citing United States v. Domnenko, 763 F.3d 768, 775
(7th Cir. 2014)). “We review the district court’s loss calculation
for clear error.” Id. Klund is ﬁghting an uphill battle because
“he must ‘show that the district court’s loss calculations were
not only inaccurate but outside the realm of permissible com-
putations.’” See United States v. Collins, 949 F.3d 1049, 1053
(7th Cir. 2020) (quoting United States v. White, 737 F.3d 1121,
1142 (7th Cir. 2013)).
6 No. 22-1191

 Klund challenges the district court’s calculation of the in-
tended loss amount on two grounds. First, he contends that
he is entitled to an oﬀset for the cost of the goods he did not
ship but intended to deliver. Second, he argues that he is en-
titled to an oﬀset for the cost of the goods that Rogue deliv-
ered.
 A
 For the ﬁrst time on appeal, Klund argues that the district
court should have given him credit for the cost of the un-
shipped goods that he insists he would have delivered had he
not been caught. At the sentencing hearing, Klund’s counsel
may have started to raise this claim, but he did not follow
through with a formal objection. Instead, he said only that “it
doesn’t make sense to me that there’s an oﬀset for goods [ac-
tually delivered] and then, you know … for the purchase or-
ders or contracts that never actually … got oﬀ the ground …
[it does not make sense] that all [of it] becomes intended loss.”
Sentencing Hearing Tr. 16. He continued with the comment
that “[Klund] would not have just gotten the money up front
and the government hoping that they get some stuﬀ later; you
got to send the stuﬀ before you ever get paid … that’s a pretty
absurd way to look at it.” Id. at 17. The government argues
that these statements were not enough to avoid a waiver of
Klund’s argument about the unshipped goods. If there was a
waiver, then the argument is oﬀ the table for appellate review.
See United States v. Brodie, 507 F.3d 527, 530 (7th Cir. 2007). But
we think that is too crabbed a reading of counsel’s remarks.
Those statements do not strike us as a “targeted strategy” to
relinquish this argument intentionally. See United States v.
Dodds, 947 F.3d 473, 476 (7th Cir. 2020) (quoting United States
No. 22-1191 7

v. Barnes, 883 F.3d 955, 957–58 (7th Cir. 2018)). Instead, this is
at most an accidental or negligent failure to object coherently.
 Such a failure is not costless: it leads to forfeiture of the
argument, and forfeited arguments are reviewed only for
plain error. United States v. Haddad, 462 F.3d 783, 793 (7th Cir.
2006); see also Puckett v. United States, 556 U.S. 129, 135 (2009).
The ﬁrst inquiry under plain error is whether there was an
error at all. Puckett, 556 U.S. at 135. Here, we conclude, there
was not, and so there is no need for us to explore the other
plain-error elements.
 Klund contends that we must credit him with the cost of
non-delivered goods that he intended to ship to the govern-
ment at the time he was caught. Those goods, he argues, did
not lead either to actual loss or to intended loss for purposes
of U.S.S.G. § 2B1.1 cmt. n.3. We can set actual loss to one side
right away, since the government never paid for goods it did
not receive. But what about intended loss? That term is de-
ﬁned in the commentary to section 2B1.1 as “the pecuniary
harm that the defendant purposely sought to inﬂict,” and it
“includes intended pecuniary harm that would have been im-
possible or unlikely to occur [without the oﬀense conduct].”
U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). As a general rule, we calculate
the amount of intended loss by considering the amount the
defendant placed at risk with the fraudulent scheme. United
States v. Durham, 766 F.3d 672, 687 (7th Cir. 2014) (collecting
cases).
 But the question whether certain monies have been placed
at risk is analytically diﬀerent from the question whether that
risk is assessed as an objective matter, or if instead we must
ask whether the defendant subjectively intended to inﬂict that
risk. Klund directs our attention to the decision in United
8 No. 22-1191

States v. Schneider, which calls for a focus on the defendant’s
subjective intent to perform fraudulently procured contracts.
930 F.2d 555, 558 (7th Cir. 1991); see also Yihao Pu, 814 F.3d at
824 (“[I]ntended loss analysis, as the name suggests, turns
upon how much loss the defendant actually intended to im-
pose.” (quoting United States v. Higgins, 270 F.3d 1070, 1075
(7th Cir. 2001))); United States v. Middlebrook, 553 F.3d 572, 578
(7th Cir. 2009) (“[T]he district court must consider the defend-
ant’s subjective intent.”); United States v. Fearman, 297 F.3d
660, 662 (7th Cir. 2002) (holding that the true measure of the
intended loss is “in the defendant’s mind.”); see also United
States v. Manatau, 647 F.3d 1048, 1056 (10th Cir. 2011) (Gor-
such, J.) (expressly approved in U.S.S.G., Supp. to App. C,
Amend. 792 at 104 (eﬀ. Nov. 1, 2015)).
 In Schneider, a building contractor fraudulently procured
a government contract. 930 F.2d at 556–57. The government
canceled the contract on the ground of misrepresentation be-
fore performance began or any payment was made. Id. at 557.
When Schneider was caught, he had some 50 outstanding
government contracts to perform. Id. at 558. Until then, he had
performed all prior contracts satisfactorily, and there was no
reason to believe he would not do so again. Id.
 We held that “[t]he amount bid for a contract procured by
fraud is not a reasonable estimate of the loss to the other party
to the contract … where the contract is terminated before that
other party—the intended victim of the fraud—has paid a
dime.” Id. at 557. Rather, if there is no evidence that the fraud-
ster was unwilling and unable to perform the contract satis-
factorily, the intended loss is only the proﬁt he intended to
receive. Id. at 558. We rooted our holding in an important dis-
tinction between two types of fraudsters:
No. 22-1191 9

 [The] true con artist … does not intend to perform his
 undertaking, the contract or whatever; he means to
 pocket the entire contract price without rendering any
 service in return. In such a case the contract price is a
 reasonable estimate of what we are calling the ex-
 pected loss … The other type of fraud is committed to
 obtain a contract that the defendant might otherwise
 not obtain, but he means to perform the contract (and
 is able to do so) and to pocket, as the proﬁt from the
 fraud, only the diﬀerence between the contract price
 and his costs.
Id. Schneider makes the point that intended loss for fraudu-
lently procured contracts amounts to “what the defendant
probably would have ‘taken’ had the fraud been realized,”
considering the defendant’s course of conduct as key evi-
dence of subjective intent. See United States v. Johnson, 16 F.3d
166, 172 n.6 (7th Cir. 1994) (discussing Schneider, 930 F.2d at
558–59).
 As applied here, the inquiry is whether Klund was willing
and able to perform the contracts he procured by fraud. If so,
the loss he purposely sought to inﬂict was the proﬁt he would
have received. Klund contends that he intended to deliver
conforming parts under his outstanding contracts. Had he
been able to continue his scheme, he represents, he would
have performed his contracts satisfactorily, as he allegedly
had done in the past. To bolster his position, Klund argues
that it would have been illogical for him to expect payment of
undelivered goods because agencies pay only for conforming
products actually received. Hence, he concludes, the district
court should have oﬀset the cost of the goods he intended to
deliver and considered only his proﬁt as the intended loss.
10 No. 22-1191

 The record, however, does not support Klund’s conten-
tions (or at the least, the district court did not commit clear
error by ﬁnding the facts adversely to Klund). The PSR states
that Klund “failed to deliver parts that he contracted with [the
Department] to provide but submitted invoices to [the De-
partment] seeking payment for parts that were never
shipped.” That is, rather than satisfactorily performing all
prior contracts, he sought payments without delivering
goods, as a “true con artist” would.
 To be sure, another factﬁnder might have drawn diﬀerent
conclusions from this record. That Klund sought payments
for non-delivered goods was mentioned in a single paragraph
without any further context. The PSR did not provide a de-
tailed breakdown of the unfulﬁlled contracts for which Klund
allegedly submitted invoices. Neither did it list witnesses
ready to testify about this speciﬁc part of Klund’s scheme.
Likewise, the PSR did not include these invoices as part of the
actual loss inﬂicted on the Department. It seems likely that the
relevant agencies discovered at least some of Klund’s false in-
voices in time to avert injury, just as they did with his scheme
in the 1990s. The PSR makes no mention of this, nor does it
explain why the Department did not debar or sanction
Klund’s entities in the face of such a blatant attempt at steal-
ing from its coﬀers. (Although, to be fair, Klund himself was
already under a debarment order, which he was evading
through the use of shell corporations and stolen identities.
And it did debar some of the entities. There were quite a few
moving pieces for it to watch.)
 But none of these ﬂaws is enough to overcome the clear-
error standard. Most importantly, these are arguments that
Klund could and should have raised before the district court.
No. 22-1191 11

His failure to object on that basis means that he accepted the
facts set forth in the PSR—and so do we.
 Furthermore, Klund’s contention that it would not make
sense to submit invoices and expect payment for non-deliv-
ered goods falls ﬂat in light of his criminal history. He already
had been convicted in the 1990s for doing exactly what he
now argues is illogical—submitting false invoices and seeking
payment for items not yet manufactured. Since “[t]he rules of
evidence do not apply to sentencing,” United States v. Richard-
son, 812 F.3d 604, 606 (7th Cir. 2016), the district court was free
to consider Klund’s prior convictions as evidence of his intent
to seek payment for unshipped goods under the outstanding
contracts.
 That is not all. The PSR speciﬁed that Klund knowingly
shipped and requested payment for 2,816 nonconforming
electrical parts. That led the Department to debar four of his
shell entities and aliases. Klund objected on grounds that the
number of nonconforming parts lacked context; since some of
the contracts concerned two or more parts, the number of con-
tracts he failed to perform satisfactorily was not as high. This
argument does nothing for him, however, because it proves
only that he knowingly shipped defective goods.
 This record supports the conclusion that Klund systemat-
ically sought payment for parts that he never shipped, as well
as for shipped, nonconforming parts. His prior convictions for
nearly identical crimes lend further credence to the district
court’s conclusion that he intended to do the same in the fu-
ture. And even if it was unlikely that the government would
have paid invoices for unshipped goods, intended loss “in-
cludes intended pecuniary harm that would have been
12 No. 22-1191

impossible or unlikely to occur.” See U.S.S.G. § 2B1.1 cmt.
n.3(A)(ii).
 Klund’s attempt to rely on Schneider backﬁres; unlike the
Schneider defendant, who satisfactorily performed all con-
tracts, Klund is more akin to a “true con artist” who intended
“to pocket the entire contract price” without delivering con-
forming parts. 930 F.2d at 558. Indeed, central to Schneider’s
holding was that the defendant’s “willingness and ability …
to perform the contracts [were] not questioned.” Id. at 558. In
contrast, the Department did not want to contract with Klund
because it already knew he was a fraudster, which is why he
was on the Excluded Parties List. The record supports the con-
clusion that Klund was neither willing nor able to fulﬁll his
contractual obligations, which evidences his subjective intent
not to perform his outstanding contracts.
 Thus, the district court did not clearly err in calculating the
intended loss by including the bid price of Klund’s outstand-
ing contracts.
 B
 Klund ﬁnally argues that the district court erred when it
failed to oﬀset the value of the conforming goods delivered
by his shell entity, Rogue. Even assuming that Klund is right,
oﬀsetting Rogue’s delivered goods would place Klund’s in-
tended loss at $4.9 million. This ﬁgure still requires an 18-level
increase because the loss amounts to more than $3,500,000 but
not more than $9,500,000. Id. § 2B1.1(b)(1)(J). Because the oﬀ-
set would not aﬀect his guidelines range, we need not address
the merits of these contentions.
 ***
 We AFFIRM the judgment of the district court.