In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-1321

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER SIMMONS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 20-cr-10029-2 — **James E. Shadid**, *Judge.*

———————————

ARGUED MAY 24, 2023 — DECIDED AUGUST 7, 2023

———————————

Before SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Christopher Simmons used another person's Social Security number to open a savings account and apply for multiple loans and credit cards at a credit union. A jury convicted Simmons of bank fraud and aggravated identity theft. Simmons challenges the latter conviction, arguing that there was insufficient evidence to prove that he knew the Social Security number was real. He also challenges the district court's loss amount finding at sentencing. We affirm.

I

In January 2020, Christopher Simmons and his brother, Adreen Canterberry, set out to defraud a credit union in Peoria, Illinois. To kick things off, Canterberry applied for a $49,900 loan to purchase an Audi on January 21. Canterberry fabricated his earnings and falsely listed Simmons as the car's seller. The next day, Canterberry went to the credit union, opened a savings account, and obtained a $49,900 cashier's check payable to Simmons.

After successfully procuring their first loan, Simmons started applying for additional loans through the credit union. On January 23, Simmons applied for a credit card with a $15,000 limit. On the application, Simmons used an Illinois woman's Social Security number, fabricated his earnings, and falsely claimed that he worked for Salesforce and was renting an apartment in Peoria. Simmons supplemented his application with two forged paystubs. By submitting his application, Simmons authorized the credit union to run a credit check using the information he provided.

Within hours of submitting his credit card application, the credit union's lending coordinator, Greg Davis, informed Simmons that it had been approved. Simmons responded that he was also in the market for a vehicle and asked whether he was pre-approved for a car loan or needed to apply separately. Davis told Simmons that he would need to submit a separate application, but if he applied within 30 days, the credit union "would not re-run [Simmons's] credit." Simmons immediately applied for a $45,930 loan to purchase an unspecified vehicle, using the same woman's Social Security number and the same false employment information and address. An hour later, the credit union informed Simmons that

it was denying his applications for both the credit card and the car loan. The high dollar amount, temporal proximity between the two applications, and inconsistencies between Simmons's address on his pay stubs (Chicago) and the apartment he listed as his residence (Peoria) all raised red flags. Davis informed Simmons that the loan officers suspected fraud and that to proceed with either application, Simmons would need to visit a local branch to be identified.

On January 24, Simmons stopped at a local branch of the credit union to cash the $49,900 cashier's check procured by Canterberry. After the teller handed Simmons the cash, she asked for a Social Security number. Simmons handed her a piece of paper with a number that had fewer digits than a valid Social Security number. Simmons left before credit-union employees discovered the problem, and they were unable to find Simmons in their system because he was not a member. Just over an hour after cashing the check, Simmons went to another branch of the credit union and used the same false information—including the same woman's Social Security number—to open a savings account. He then went online and reapplied for a $15,000 credit card. Simmons again authorized the credit union to obtain his credit report. This second credit card application was also denied.

On January 28, Simmons applied for another car loan— this one for $50,496.75—ostensibly to purchase a Maserati. Again, Simmons used the same woman's Social Security number and provided the same false information about his employment and residence. And again, Simmons was told that by submitting his application, he authorized the credit union to obtain his credit report. By that point, however, the credit union had caught on to Simmons's fraud. After

reporting its findings to law enforcement, the credit union invited Simmons to come to the office to sign paperwork to close the car loan. When Simmons showed up and signed the paperwork to receive his $50,496.75 check on January 31, undercover detectives arrested him on the spot.

Soon thereafter, a grand jury indicted Simmons on three counts of bank fraud, 18 U.S.C. § 1344, and one count of aggravated identity theft, 18 U.S.C. § 1028A(1), (c)(5). The bank fraud alleged in Count Two of the indictment—which concerned Simmons's use of fraudulent information to open the savings account on January 24—served as the predicate offense for the aggravated identity theft charge. The case proceeded to a two-day jury trial in October 2021. At the close of the government's case, Simmons moved for a judgment of acquittal on the aggravated identity theft count under Federal Rule of Criminal Procedure 29(a). Simmons argued that the government had not proved that he knew the Social Security number belonged to another person. The district court denied the motion and sent the case to the jury, which found Simmons guilty on all counts. Simmons renewed his motion for a judgment of acquittal, but the court again denied the motion.

At sentencing, Simmons objected to the Presentence Investigation Report's calculation of the intended loss amount. The PSR calculated Simmons's total intended loss amount at $176,326. The amount included the cashier's check Simmons had cashed (which Simmons did not dispute), plus each loan and credit card amount for which he had applied—the January 23 credit card, the January 23 car loan, the January 24 credit card, and the January 28 car loan. Simmons argued that the PSR incorrectly double counted the credit card and car loan applications because he only intended to obtain one

credit card and one auto loan from the credit union. In other words, if he had succeeded in obtaining the credit card and car loan on January 23, he would have stopped. Excluding the January 24 and January 28 applications would have brought the loss amount under $150,000, resulting in an enhancement of only eight levels instead of ten. See U.S.S.G. § 2B1.1(b).

The district court adopted the PSR's loss amount, finding that each application represented "separate incidents, separate counts, individual attempts" and that no evidence supported Simmons's argument that he would've stopped pursuing more loans if he had obtained the credit card and car loan on January 23. After applying the ten-level enhancement, the district court calculated Simmons's Guidelines range at 30 to 37 months for the bank fraud counts. The court sentenced Simmons to an above-Guidelines sentence of 46 months on the bank fraud counts, followed by a mandatory consecutive sentence of 24 months on the aggravated identity theft count.

## II

On appeal, Simmons challenges the sufficiency of the evidence supporting his identity theft conviction and the district court's loss amount finding. We address each issue in turn.

## A

We review the denial of a motion for judgment of acquittal de novo, but in practice, "the standard of review is that for sufficiency of the evidence." *United States v. Fitzpatrick*, 32 F.4th 644, 648 (7th Cir. 2022). "In a sufficiency-of-the-evidence challenge after a jury verdict, we review the evidence presented at trial in the light most favorable to the government and draw all reasonable inferences in its favor." *Id.* at 648–49 (quoting *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir.

2021)). "[W]e defer heavily to the jury's findings … and will reverse only where no rational trier of fact could have found the defendant guilty." *United States v. Armbruster*, 48 F.4th 527, 531 (7th Cir. 2022) (cleaned up).

A person is guilty of aggravated identify theft if "during and in relation to" committing a qualifying felony (here, bank fraud), he "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)(1), (c)(5). Our focus is on the statute's requirement that the government prove that the defendant "knew that the means of identification at issue belonged to another person." *Flores-Figueroa v. United States*, 556 U.S. 646, 657 (2009). There is no dispute that Simmons used the same woman's means of identification—her Social Security number—repeatedly and without her consent. The only question is whether the jury heard sufficient evidence to find that Simmons knew that the number was real.

A defendant's mens rea may be proven with circumstantial evidence, see *United States v. Coscia*, 866 F.3d 782, 797–98 (7th Cir. 2017), and knowledge under § 1028A is no exception. See, e.g., *United States v. Gandy*, 926 F.3d 248, 258 (6th Cir. 2019) ("The government can use circumstantial evidence to demonstrate that a defendant knew that he or she was using means of identification that belonged to another person."); *United States v. Delva*, 922 F.3d 1228, 1249–50 (11th Cir. 2019) (same); *United States v. Doe*, 842 F.3d 1117, 1120–21 (9th Cir. 2016) (same); *United States v. Soto*, 720 F.3d 51, 55 (1st Cir. 2013) (same).

It was reasonable for the jury to conclude that Simmons knew that he was using a real Social Security number when he opened the savings account on January 24. The day before,

Simmons had authorized the credit union to run a credit check when he applied for a credit card. The credit union notified Simmons that he'd been approved for the card and that it would not "re-run" his credit if he applied for a car loan. At that point, Simmons knew that the Social Security number had worked: the credit union confirmed it had run his credit and his application had still been approved. Things fell apart when Simmons used the same Social Security number to immediately apply for a car loan. Undeterred, Simmons used the same Social Security number—the one he knew had resulted in a successful credit check—to open a savings account at the credit union the very next day. This evidence alone was sufficient to support the jury's verdict.

Additionally, Simmons's conduct at the other branch on January 24 further supported the verdict. After Simmons received $49,900 for the cashier's check and the teller asked him for a Social Security number, Simmons simply made one up. When combined with Simmons's knowledge of a successful credit check on January 23, a reasonable juror could conclude that Simmons knew when he needed to use a real Social Security number (on applications that authorized a credit check), and when he could get by without one (when handing it to a teller after already receiving his cash). Simmons's use of other real (but false) information on each application— claiming that he worked at Salesforce and that he lived in Peoria—further support such an inference. Putting it all together, the evidence was sufficient to find that Simmons knew that the Social Security number he repeatedly used was, in fact, real.

B

We review the district court's calculation of loss amount for clear error. *United States v. Klund*, 59 F.4th 322, 326 (7th Cir. 2023). A defendant must "show that the district court's loss calculations were not only inaccurate but outside the realm of permissible computations." *Id*. (cleaned up).

The focus here is on Simmons's intended loss amount, meaning "the pecuniary harm that [Simmons] purposely sought to inflict," including "pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1, App. Note 3(A)(ii). In other words, intended loss includes "both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose. That is, § 2B1.1 holds a defendant accountable for the full amount of the loss he was prepared to inflict." *United States v. Elizondo*, 21 F.4th 453, 473 (7th Cir. 2021) (cleaned up).

Simmons does not dispute the loss amount's inclusion of the $49,900 car loan or the amounts he tried to obtain on January 23. But the district court engaged in "double counting" by including the January 24 and January 28 amounts, Simmons says, because he intended to procure only one credit card and one car loan. He therefore contends that his total loss amount should have been $110,830, not $176,326, which would have lowered his Guidelines range from 30 to 37 months to 24 to 30 months. See U.S.S.G. § 2B1.1(b).

The district court did not clearly err when it included each application in its loss amount calculation. Simmons argues that his emails to the credit union that he was in the market for a single "vehicle" and that he was "reapplying" for credit suggest that, despite his multiple applications for different

amounts, he only intended to obtain one credit card and one car loan for one vehicle. While the district court could have accepted Simmons's theory, it was certainly not the only permissible conclusion. Simmons submitted two different car loans (one identifying a vehicle and one that didn't), for different amounts, on different days, each constituting its own separate crime of bank fraud. That the credit union sniffed out his efforts and denied his applications does not mean he lacked the intent to obtain all of the funds for which he applied. The court thus did not err when it concluded that Simmons intended to obtain each loan and that both should count toward his intended loss amount. And because the court did not err by including both car loans, any error in including the second credit card amount would have been harmless. Subtracting $15,000 from the loss amount still would have resulted in a loss amount greater than $150,000, so Simmons's Guidelines range would have been exactly the same.

Because sufficient evidence supported Simmons's aggravated identity theft conviction, and the district court's loss amount finding was not clearly erroneous, we affirm Simmons's conviction and sentence.

AFFIRMED