# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 27, 2011

No.  09-20699

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellant

v.

MARK DAVID RADLEY; JAMES WARREN SUMMERS;
CODY DEAN CLABORN; CARRIE KIENENBERGER,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and REAVLEY and HAYNES, Circuit Judges.
EDITH H. JONES, Chief Judge:

The United States appeals from the district court's order dismissing the indictment of Appellees for wire fraud and violations of the Commodities Exchange Act (CEA), 7 U.S.C. § 13(a)(2).  Because Appellees' conduct fell within a statutory exemption for off-exchange commodities transactions, we affirm the dismissal of the indictment's price manipulation and cornering counts.  Although the CEA exemption does not necessarily inoculate Appellees from the wire fraud statute, we affirm the district court's dismissal of the wire fraud counts.

No.  09-20699

## I.  Background

Appellees Mark David Radley, James Warren Summers, Cody Dean Claborn, and Carrie Kienenberger worked as commodities traders for BP Products North America Inc.  Among other things, they traded futures in "TET propane," which is propane stored in a salt dome near Mont Belvieu, Texas, and transported in a pipeline system belonging to the Texas Eastern Products Pipeline Company, LLC.  TET propane, along with the propane stored in two other Mont Belvieu salt domes, is the primary supply of propane sold between Gulf Coast producers and Midwestern and Northeastern consumers.

TET propane futures do not trade on an exchange.  Rather, buyers and sellers place bids on an electronic interface called Chalkboard, negotiate deals directly, or use brokers to negotiate deals on their behalf.  Bids and offers are anonymous, though all market participants can see the price and quantity of each transaction.  Each day, the Oil Price Information Service (OPIS) compiles data on the day's trades and publishes an average price.

Beginning in early February 2004, the Appellees began purchasing a large number of futures contracts for delivery at the end of that month—*i.e.*, taking a "long position" in February TET propane.  They did so through the Chalkboard system, placing multiple bids at different prices and quantities.  They also entered agreements to sell February TET propane at the OPIS average price.  Because of Appellees' ambitious (and risky) buying campaign, the price of futures skyrocketed from 61 cents per gallon on February 9, 2004 to a high of 94 cents on February 27, 2004, the last trading day before delivery on February 29.  After the February contracts came due, the price of propane futures plummeted.  On March 1, the price of March TET propane fell almost 25 cents per gallon to settle at 61.75 cents.

BP made money from Appellees' activity in two ways.  First, some of the people who sold futures contracts (the "shorts") did not actually have any

propane to sell ("naked shorts"); in order to fulfill their obligation, they needed to repurchase TET propane at the high price prevailing after Appellees' buying campaign was underway, often from Appellees themselves. Second, Appellees' contracts to sell at future OPIS prices generated profits because the OPIS price increased with Appellees' voracious demand.

On October 25, 2007, following a two-year investigation, a grand jury in the Northern District of Illinois returned a twenty-count indictment against Appellees. The district court transferred that case to the Southern District of Texas, where a second grand jury returned a twenty-six-count superseding indictment on January 29, 2009. The superseding indictment charged price manipulation, attempted price manipulation, cornering the market, attempted cornering, wire fraud, and conspiracy to commit those crimes. According to the government, Appellees attempted to drive up the price of February TET propane by placing multiple bids on Chalkboard—"stacked bids"—in order to trick other market participants into believing that demand for the commodity was strong and came from more than one source. Moreover, Appellees placed bids at prices higher than other bidders had posted, allegedly perpetrating their deception by enticing other market participants to transact at higher prices. The indictment finally alleged that Appellees withheld information about the extent of their purchases and falsely denied attempting to corner the market.

Appellees moved to dismiss the indictment, and the district court granted their motion. The district court cited several grounds for dismissal. First, the court reasoned that the transactions in question fell within a statutory exception to the CEA's ban on price manipulation and cornering. *United States v. Radley*, 659 F. Supp. 2d 803, 809-10 (S.D. Tex. 2009). Second, the court held that even if the statutory exclusion did not apply, dismissal was appropriate because the CEA's price manipulation provision was unconstitutionally vague. *Id.* at 816. Third, again assuming the exclusion did not apply, the court concluded that the

No. 09-20699

indictment failed to allege one of the two elements of cornering the market: a dominant position in futures contracts plus control of the underlying asset. *Id.* at 817-18. Finally, the court dismissed the wire fraud counts because the indictment failed to allege a misrepresentation of material fact. *Id.* at 820. The government, as Appellant, challenges each of these decisions.

## II. Standard of Review

We review *de novo* both the district court's construction of the CEA and its determination that the indictment failed to allege all elements of wire fraud. *United States v. Jho*, 534 F.3d 398, 402 (5th Cir. 2008); *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004). The allegations in the indictment are presumed true for present purposes. The district court, no doubt intending to cover all bases, discussed in some detail Appellees' contention that the CEA's anti-manipulation provision, § 13(a)(2), is unconstitutionally vague. *Radley*, 659 F. Supp. 2d at 813-15. Because we conclude that the exemption in § 2(g) shielded Appellees' conduct, we reserve comment on the constitutional issue.

## III. Discussion

### A. § 2(g)

The CEA makes it a felony for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce . . . or to corner or attempt to corner any such commodity . . . ." 7 U.S.C. § 13(a)(2). In 2000, Congress updated the CEA by passing the Commodity Futures Modernization Act (CMFA), Pub. L. No. 106-554, § 1(a)(5), 114 Stat. 2763. The CFMA aimed to dispel uncertainty over the reach of the CEA and prevent the commodity futures market from fleeing the United States. CFMA § 2(5)-(6),(8). As modified by the CFMA, the CEA exempts from its regulations certain off-exchange transactions in non-agricultural commodities: "No provision of this chapter . . . shall apply to or govern any agreement, contract, or transaction in a commodity other than an agricultural commodity," provided three conditions are met.

4

No.  09-20699

7 U.S.C. § 2(g).[1]  The conditions require that the contract was "(1) entered into only between persons that are eligible contract participants at the time they enter into the agreement, contract, or transaction; (2) subject to individual negotiation by the parties; and (3) not executed or traded on a trading facility." *Id*.  The district court carefully explained how the subject matter of this case satisfies the statutory conditions of the exception.  *Radley*, 659 F.Supp. 2d at 811-12.   On appeal, the government does not challenge the conditions' satisfaction.  Instead, the parties dispute the reach of the exemption itself.

The dispute focuses on the meaning of "transaction" in Section 2(g).  The activities alleged in the indictment—placing "stacked bids," withholding supply from the market, falsely denying a scheme to corner the market, and falsely stating that BP intended to consume its propane—are not contracts, but whether they are part of a "transaction" or "agreement" is a more difficult question.  Neither this Circuit nor the Supreme Court has defined "transaction"  for purposes of the CEA.  Other courts have struggled with the issue but failed to produce a test to identify which conduct is sufficiently disconnected from a purchase and sale to fall outside the definition of a transaction.

The government argues for a narrow meaning of "transaction," rooted in *dicta* from this Court's unpublished decision in *United States v. Futch*, 278 Fed. App'x 387 (5th Cir. 2008).  *Futch* affirmed the conviction of a natural gas trader who made false statements to an industry publication about the prices his company was paying for natural gas.  *Id*. at 389-90.  "Inaccurate reports" are unlawful under the CEA.  *See* 7 U.S.C. § 13(a)(2).  Although § 2(g) was enacted after the conduct in *Futch*, the Fifth Circuit noted in *dicta* that the exemption would not have helped the defendant because he "was not indicted for entering into an 'agreement, contract or transaction,' but for distributing false market

---

[1] The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, repeals § 2(g), effective July 21, 2011.

No.  09-20699

information under § 13(a)(2)." *Futch*, 278 Fed. App'x at 392.  Other courts have also concluded that false reporting is not part of a CEA-exempt agreement, contract or transaction.  The Southern District of Texas, for example, refused to apply the exclusion in § 2(g) when a trader reported fictitious transactions to a trade journal.  *CFTC v. Johnson*, 408 F. Supp. 2d 259 (S.D. Tex. 2005); *see also CFTC v. Reed*, 481 F. Supp. 2d 1190 (D. Colo. 2007), *CFTC v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005).

Even accepting *arguendo* the consensus that § 2(g) does not protect outright fabrications, the false reporting cases nevertheless prove too much. Beyond the necessary finding that a defendant violates the CEA when he reports transactions that never occurred, the courts hearing false reporting cases tend to advance a narrow construction of "contract, agreement, or transaction."  The *Johnson* court, for example, declared that "the exemptions are, by their terms, limited to contracts, agreements or transactions—denoting mutual exchanges between parties."  408 F. Supp. 2d at 271.  *Bradley* likewise confines "contract, agreement, or transaction" to "a mutual understanding between parties creating rights or obligations that are enforceable or are recognized at law."  408 F. Supp. 2d at 1219.   The government seizes upon these interpretations of § 2(g) that may only exempt activities which create legally enforceable obligations.  Tracing the lineage of this definition through citations like that in *Bradley*, however, leads to one source: the dictionary definition of "contract."  *Bradley*, 408 F. Supp. 2d at 1219 (citing BLACK'S LAW DICTIONARY 318 (7th Ed. 1999)), *Johnson*, 408 F. Supp. 2d at 271-72 (citing Black's Law Dictionary and language nearly identical to *Bradley*, which corresponds to the dictionary's definition of "contract").  None of the false reporting cases on which the government relies distinguishes between contracts and the other activities listed in § 2(g).

Yet, the citations in *Bradley* and *Johnson* embody the fundamental interpretive error of extending the definition of one term in a three-term series

6

to cover the entire trio.  Their methodology violates the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441 (2001) (internal citations omitted).  The interpretation in *Bradley* and *Johnson* renders the terms "transaction" and "agreement" superfluous.  For this reason, the government's cases, which could at best constitute persuasive authority, fail to persuade.

In the absence of reliable precedent, the scope of § 2(g) is a matter of first impression.  "As in any case involving statutory interpretation, we begin by examining the text of the relevant statutes."  *United States v. Rains*, 615 F.3d 589, 596 (5th Cir. 2010).  Contrary to the government's expedient position, the text of the CEA broadly defines a transaction.  In a provision discussing the CFTC's jurisdiction, the statute refers to "agreements (including transactions . . . commonly known to the trade as . . . [a] 'bid' [or] 'offer' . . . )."  7 U.S.C. § 2(a)(1)(A).  While not a precise definition, this provision sheds enough light on the CEA's argot to reject the government's narrow interpretation.  Because both terms encompass bids and offers, the quoted language shows that agreements and transactions cover more than enforceable contracts.  The same provision refers to "transactions *involving* contracts."  *Id.* (emphasis added).  This language confirms that contracts and transactions have separate meanings and triggers this Court's duty to give effect to both terms.  *United States v. Molina-Gazca*, 571 F.3d 470, 474 (5th Cir. 2009).  The CEA's own language belies the argument that "transaction" refers only to a completed and enforceable contract.

Beyond the law itself, dictionary definitions inform the plain meaning of a statute.  *See United States v. Ferguson*, 369 F.3d 847, 851 (5th Cir. 2004) (employing a dictionary in order to "give the words of statutes their plain

meaning."). Black's Law Dictionary defines a transaction as "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract." BLACK'S LAW DICTIONARY 1535 (8th ed. 2004). This definition is also consistent with the outcome in *Futch* and the other false reporting cases; reporting nonexistent transactions is not part of "conducting business" and therefore finds no sanctuary in § 2(g).

Applying the ordinary meaning of "transaction" to the conduct identified in the indictment shows that Appellees' activities fall within the scope of § 2(g).[2] The indictment lists three behaviors that the government asserts are not transactions. First, it alleges that Appellees placed bids on Chalkboard without intending to enter into a transaction based on each bid, but rather for the purpose of misleading other market participants about the demand for February TET propane. Placing disingenuous bids, the argument goes, was a deception rather than the first step in a transaction. Second, the indictment asserts that Appellees misled the market by refusing to buy propane at a discounted price unless the seller agreed to conceal the discount from other market participants. According to the government, a refusal to buy at a lower price is a non-transaction subject to § 13(a)(2) because refusing to enter into a transaction cannot be a transaction. Third, the government argues that § 2(g) does not protect Appellees' statements denying their plan to drive up the price of propane. The alleged denials include Mr. Claborn's statement that BP would consume its propane at some point and his comment that a fellow trader was "badly mistaken" in suggesting that BP was attempting to corner the market. We evaluate each of these purported non-transactions under the definition established above.

---

[2] We emphasize that conduct falling within the CEA's broad definition of "transaction" must still meet the qualifying conditions of § 2(g) to be exempt. There is no argument here that the alleged conduct does not meet those qualifying conditions.

No. 09-20699

Appellees' bidding activities fall within the ordinary meaning of "transaction," as well as the CEA's internal definition. As quoted above, the CEA includes conduct "commonly known to the trade as . . . [a] 'bid' [or] 'offer'" within the scope of a transaction. 7 U.S.C. § 2(a)(1)(A). Under the dictionary definition of a transaction as "conducting business," Appellees' bids are likewise covered. In fact, under the Chalkboard system, traders cannot conduct their business without placing bids and offers.

To focus, as the government does, on the possibility that the bids could convey information about the number of buyers for TET propane is to overlook the bids' legitimacy. Unlike the false reports in *Futch*, the bids in this case were real; a counter-party could have accepted them and formed an enforceable contract at any time. Indeed, that event occurred routinely, proving that the bids were genuine. The indictment misses this point and instead recasts both successful and unsuccessful bids as proof of malfeasance. It characterizes bids that failed to attract a seller (despite being the highest price when placed) as ploys to "prevent other market participants from engaging in transactions at prices lower than the conspirators' bids." Where Appellees' bids found a seller, however, the indictment complains of "purchases of February 2004 TET propane for the purpose of preventing a drop in the price and acquiring control of the supply . . . ." ¶ 60. While weaving its damned-if-you-do-damned-if-you-don't web, the indictment demonstrates that Appellees' bids were bona fide and that other market participants freely chose which bids to accept and which to reject. Unless they were somehow illusory, which was not the case, Appellees' bids were part of their transactions in February TET propane futures. As such, § 2(g) excludes them from the reach of the CEA.

The same conclusion obtains in the case of statements designed to conceal Appellees' long position and their refusal to buy propane at a discount. Both of these alleged actions differ from the bidding activity in that they could not

9

culminate in the formation of a contract.   Nevertheless, the process of "conducting business" encompasses negotiation and communication that fails to produce an agreement.   Negotiations are as integral to a transaction as the consummating signature.  *See, e.g., Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 587 (3d Cir. 1975) (holding in the context of securities fraud that early negotiations "may fairly be considered part of the original transactions"), *Progress Tailoring Co. v. FTC*, 153 F.2d 103, 105 (7th Cir. 1946) ("preliminary negotiations were all an essential part of the entire transaction.").

In the case of refusals to sell, excluding them from the exemption in § 2(g) opens the door for prosecution based on early-stage negotiations, even if an early refusal (perhaps even in the face of a discount) leads to a better price and subsequent agreement.   For that matter, the fact of a subsequent agreement cannot be decisive in whether early refusals are exempt; otherwise, criminality attaches only when the allegedly manipulative deal does *not* occur.   Because a transaction encompasses more than the execution of a contract, negotiations cannot be removed from the protection of § 2(g).

Finally, the indictment alleges violations of the CEA based on Appellees' efforts to conceal their long position in February TET propane.   These include Appellee Claborn's denial that he was running a corner, his statement to another trader that BP intended to consume its propane purchases, and Appellees' efforts to conceal their long position from supervisors at BP.   The government maintains that these actions are analogous to the false reporting in *Futch*.   As the district court explained, however, *Futch* involved false reports of sales that did not actually occur.  *Radley*, 659 F. Supp. 2d at 810.   By contrast, the statements here concerned genuine transactions—and transactions protected by § 2(g), no less.   We reject the government's proffered construction of § 2(g) that shields every aspect of a transaction while requiring the people involved to disclose their strategy to even the most informal of inquiries from other parties.

No.  09-20699

*See Dunn v. CFTC*, 519 U.S. 473, 476-77, 119 S. Ct. 913, 919 (1997), (rejecting CFTC's narrow construction of an exemption for "transactions in foreign currency" and noting CFTC's agreement that "futures contracts are a *subset*" of those transactions (emphasis added)).  The correct tools for prosecuting false or misleading statements in connection with exempt transactions are, if anything, the fraud statutes, to which we now turn.

### B.  Wire Fraud

Counts 20 through 26 of the indictment allege wire fraud in violation of 18 U.S.C. § 1343.  That statute punishes wire, radio and television communications in furtherance of "any scheme or artifice to defraud." 18 U.S.C. § 1343.  To prove wire fraud, "the government must prove: (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." *United States v. Ingles*, 445 F.3d 830, 838 (5th Cir. 2006) (internal quotations omitted).  Although the language of § 1343 does not require a material misrepresentation, the Supreme Court has interpreted the statute to call for one. *Neder v. United States*, 527 U.S. 1, 20-25, 119 S. Ct. 1827 (1999).  The test for materiality is whether a misrepresentation "has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Valencia*, 600 F.3d 389, 426 (5th Cir. 2010).  *Valencia* is the most recent case involving false reporting in the commodities context.  Unlike *Futch*, however, the appeal in *Valencia* focused on wire fraud alone.  Finally, "[v]iolation of the wire-fraud statute requires the specific intent to defraud . . . ." *United States v. Brown*, 459 F.3d 509, 519 (5th Cir. 2006).

In the present case, neither party contests that Appellees communicated by wire in furtherance of their strategy to profit from increasing prices of February 2004 TET propane.  Whether that strategy constitutes a "scheme or artifice to defraud" is before this court.  Without an antecedent scheme to

11

defraud, the wire fraud charges cannot survive. *Matter of Lewisville Properties, Inc.*, 849 F.2d 946, 951 (5th Cir. 1988). The indictment here re-alleges as the "scheme to defraud" the same conduct and transactions that we have already found exempt from regulation under § 2(g). Appellees rely on the principle that when a grand jury charges one specific theory of a scheme to defraud, the defendant may not be convicted based on another theory. *United States v. Hoover*, 467 F.3d 496, 498, 500-02 (5th Cir. 2006). Thus, when the government's allegations charge market manipulation and cornering as the "scheme to defraud," and our preceding discussion explains why this is not criminal conduct when falling within the § 2(g) exemption for OTC propane trades, the same scheme cannot alone be re-characterized and rendered illegal as wire fraud.

We agree with Appellees' argument supporting dismissal on this basis, although with the caveat that § 2(g) cannot wholly exempt participants in unregulated commodities transactions from conventional wire fraud charges. As the government notes, fraud can occur any time defendants make material misrepresentations in an attempt to obtain money or property. Where § 2(g) does not apply, this court has considered allegations of common-law fraud in the commodities trading context. *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 620 F.3d 465 (5th Cir. 2010) (applying Texas law). In this case, however, the only grounds the government alleged for a scheme to defraud are precisely those actions that are exempt.

### IV. Conclusion

We decline to review the district court's conclusion that the CEA's price manipulation provision is unconstitutionally overbroad. Reaching this issue is unnecessary given the applicability of § 2(g). As we conclude that the statutory exemption covers all aspects of a transaction, Appellees' risky campaign of buying propane futures in the hope that other traders would not detect their

No.  09-20699

efforts was lawful.  Nor did Appellees' statements or omissions amount to actionable wire fraud.

**AFFIRMED.**