In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 23-1528 & 23-1530

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN PACILIO and EDWARD BASES,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cr-00048 — **John Z. Lee**, *Judge.*

_____

ARGUED SEPTEMBER 7, 2023 — DECIDED OCTOBER 23, 2023

_____

Before BRENNAN, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges.*

BRENNAN, *Circuit Judge.* John Pacilio and Edward Bases appeal their convictions for fraud through the manipulation of the precious metals market by "spoofing"—placing a deceptive order with no intent to trade to push the market in a certain direction. Defendants challenge their convictions on due process grounds, and they dispute several evidentiary

rulings at trial. For the reasons set forth below, we affirm the district court's judgments.

## I. Factual Background and Procedural History

Pacilio and Bases were senior traders on the precious metals trading desk at Bank of America Merrill Lynch ("Bank of America"), in New York. They conducted their trading on two commodities exchanges, COMEX and NYMEX, operated by the Chicago Mercantile Exchange (CME). While working together at Bank of America from 2010 until 2011, and at times separately before and after that period, they engaged in a fraudulent scheme, known as spoofing, to manipulate the prices of precious metals.

The mechanics of commodities futures trading make spoofing possible. A commodities futures contract is a standardized agreement between a buyer and a seller to buy and sell a set amount of a specific commodity, at a set price, on a set, future date. Historically, the trading of commodities futures through the CME occurred in person on the CME trading floor. Since 2007, most CME trading takes place on the CME's electronic trading platform, Globex, which allows traders to place buy or sell orders on certain numbers of futures contracts at a set price. Traders place these orders manually or through programmed algorithms.

Commodity prices are determined by supply and demand. Orders placed in the CME order book communicate buying and selling interest, affecting the market price for futures contracts. The larger the order, the larger the effect on the commodity's market price. Because larger orders can significantly impact the market, Globex permits traders to place "iceberg" orders, showing only a partial amount of the full

order. Traders on the COMEX and NYMEX exchanges may cancel an order before it is executed. But, it is assumed that every order placed is bona fide and placed with "intent to transact." Spoofing schemes take advantage of this assumption by manipulating the market through the placement of large orders that are unintended to be executed. Spoofing consists of (1) placing an order, typically a large iceberg order, on one side of the market that is intended to be traded, and (2) placing a spoof order, fully visible but not intended to be traded, on the other side of the market. The spoof order pushes the market price to benefit the iceberg order, allowing the trader to execute the iceberg order at a desired price. The spoof order is then cancelled before it can be filled.

On several occasions, each defendant placed an iceberg order to sell commodities contracts above the prevailing market price while simultaneously submitting visible spoof orders pushing the market price higher. Once the market price reached the level of the intended sale offer, the entire iceberg sell order was executed, and all the visible spoof orders were cancelled. Defendants also engaged in coordinated episodes, where one would place an iceberg buy order and the other would flood the market with spoof sell orders. The market price would plummet and enable filling the iceberg order at the desired price.

Pacilio and Bases do not contest these facts. Rather, they challenge the constitutionality of their convictions, dispute the sufficiency of the evidence, and criticize the district court's evidentiary rulings.

A federal grand jury indicted Pacilio on one count of conspiracy to commit wire fraud affecting a financial institution; seven counts of wire fraud affecting a financial institution;

one count of commodities fraud; and one count of violating the anti-spoofing provision of the Dodd-Frank Act. The grand jury similarly indicted Bases on one count of conspiracy to commit wire fraud affecting a financial institution; nine counts of wire fraud affecting a financial institution; and one count of commodities fraud.

Before trial, the government disclosed its plans to call CME representatives to testify that CME Rule 432 has always prohibited spoofing. Rule 432, in place since 1989, prohibits traders from attempting to engage or engaging in "the manipulation of prices of exchange futures or options contracts;" "any manipulative device, scheme, or artifice to defraud;" or offering to purchase or sell "exchange futures or options contracts, or any underlying commodities or securities, for the purpose of upsetting the equilibrium of the market or creating a condition in which prices do not or will not reflect fair market values." This testimony, the government asserted, would support their implied misrepresentation theory.

The defendants moved to preclude this testimony as irrelevant and improper, arguing that CME representatives' subjective interpretations of Rule 432, never disclosed to market participants, could neither form the foundation of an implied misrepresentation nor support a finding of intent to defraud. The district court denied the motion, concluding that Rule 432 was ambiguous as a matter of law as to whether it prohibited spoofing. Therefore, the government could offer extrinsic evidence from CME representatives interpreting the rule.

At trial, the parties presented substantial evidence. Pursuant to the district court's pre-trial ruling, the government called as witnesses two CME representatives, John Scheerer and Robert Sniegowski. Scheerer, a CME Senior Director,

testified that each order placed on the CME exchanges was expected to be a "bona fide order … placed with intent to transact." Sniegowski, the longtime director of the CME's Rules and Regulatory Outreach group, similarly testified the CME requires orders "be placed with the intent to buy" and sell—and Rule 432 prohibits spoofing. Sniegowski also outlined the mechanics of spoofing and explained that a spoof order is a deceptive order placed with "no intent to trade" to "push the market in a particular direction."

The government also called an employee who worked with Pacilio and Bases, Harnaik Lakhan, as a cooperating witness. Lakhan testified he engaged in spoofing and knew at the time it was "wrong." He described how he, Pacilio, and Bases carried out the spoofing scheme by placing orders they intended to cancel for the sole purpose of "manipulat[ing] the price to the level you wanted it." He admitted spoofing placed "false information" into the market both "as to demand, supply," and "intent" to trade, and stated defendants placed spoof orders "frequently" in the precious metals futures markets. When cross-examined, Lakhan did not recall a CME rule prohibiting spoofing, was not familiar with Rule 432, and did not remember any pre-Dodd-Frank compliance training mentioning spoofing. Additionally, the government presented testimony from bank officials concerning bank policies at the time of Pacilio's and Bases's conduct. These witnesses, John Juul and Ed McLaren, compliance officials with Deutsche Bank and Bank of America respectively, testified spoofing was always prohibited at their banks.

The jury found Pacilio guilty of conspiracy to commit wire fraud affecting a financial institution, wire fraud affecting a financial institution, and commodities fraud, but not guilty of

spoofing in violation of Dodd-Frank. The jury found Bases guilty of conspiracy to commit wire fraud affecting a financial institution and wire fraud affecting a financial institution, but not guilty of commodities fraud. The district court sentenced each defendant to 12 months and one day in prison.

## II. Discussion

Defendants raise three challenges to their convictions. They assert the commodities and wire fraud statutes are unconstitutionally vague as applied to them in violation of the Fifth Amendment's due process guarantee. They also challenge the sufficiency of the evidence supporting their convictions for conspiracy to commit wire fraud and Pacilio's conviction for commodities fraud. Finally, they argue the district court abused its discretion in admitting the testimony of the CME representatives and bank officials and excluding certain evidence of Bases's good faith.

### A. Due Process Challenge

We review de novo both constitutional challenges to a conviction and vagueness challenges. *United States v. Coscia*, 866 F.3d 782, 791 (7th Cir. 2017); *United States v. Sandidge*, 863 F.3d 755, 758 (7th Cir. 2017). The Fifth Amendment guarantees "[n]o person shall … be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. This guarantee forbids vague criminal laws. *Johnson v. United States*, 576 U.S. 591, 595 (2015). To satisfy this guarantee, a criminal statute must "define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v.*

*United States*, 561 U.S. 358, 402–03 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

"The void-for-vagueness doctrine prohibits the government from imposing sanctions under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes." *Welch v. United States*, 578 U.S. 120, 124 (2016) (internal quotation marks omitted). "A vagueness challenge not premised on the First Amendment is evaluated as-applied, rather than facially." *United States v. Calimlim*, 538 F.3d 706, 710 (7th Cir. 2008). The "touchstone" of constitutional fair notice "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). "[A] scienter requirement in a statute alleviates vagueness concerns." *McFadden v. United States*, 576 U.S. 186, 197 (2015) (internal marks omitted). Two statutory prohibitions are relevant. Title 18 U.S. Code § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice … .

The commodities fraud statute states:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud any person in connection with any commodity for

> future delivery, or any option on a commodity
> for future delivery … ; or (2) to obtain, by means
> of false or fraudulent pretenses, representa-
> tions, or promises, any money or property in
> connection with the purchase or sale of any
> commodity for future delivery, or any option on
> a commodity for future delivery … .

18 U.S.C. § 1348.

We have held twice—in *Coscia* and in *United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022)—that spoofing violates the wire fraud and commodities fraud statutes. In *Coscia*, we considered "whether spoofing amounts to a 'scheme to defraud'" within the meaning of the commodities fraud statute. *Chanu*, 40 F.4th at 540 (citing *Coscia*, 866 F.3d 782). Coscia placed large spoof orders opposite small orders on CME exchanges in 2011 and used a preprogrammed algorithm to quickly cancel the spoof orders before they were filled. *Coscia*, 866 F.3d at 788-90. The government alleged Coscia placed the spoof orders "to create illusory supply and demand and, consequently, to induce artificial market movement." *Id.* at 785. Coscia was convicted of commodities fraud in violation of 18 U.S.C. § 1348(1), and spoofing, in violation of 7 U.S.C. § 6c(a)(5)(C). *Id.* Our court affirmed. *Id.* As to his commodities fraud conviction, Coscia argued "because 'his orders were fully executable and subject to legitimate market risk,' they were not, as a matter of law, fraudulent." *Id.* at 797. This court rejected that argument. *Id.*

In *Chanu*, we again affirmed that spoofing was fraud, this time in a situation very similar to and involving the same scheme as the one Pacilio and Bases employed. Cedric Chanu and James Vorley were precious metals traders at Deutsche

Bank who traded futures contracts on the COMEX exchange using CME's Globex platform. *Chanu*, 40 F.4th at 532. They "placed orders for precious metals futures contracts on one side of the market that, at the time the orders were placed, they intended to cancel prior to execution"—though unlike Coscia, Chanu and Vorley placed their trades manually. *Id.* at 533, 540. Chanu and Vorley were convicted on several counts of wire fraud. *Id.* at 538. On appeal we addressed whether the manual spoofing conduct violated the wire fraud statute and held it was determined by two questions: "Was there a scheme to defraud by means of false representations or omissions, and were such false representations or omissions material?" *Id.* at 539. "*Coscia* establishes that placing orders on opposite sides of the commodities market with the intent to cancel amounts to a 'deceitful' scheme, aiming to 'manipulate the market for [the trader's] own financial gain.'" *Chanu*, 40 F. 4th at 540 (quoting *Coscia*, 866 F.3d at 797).

The *Chanu* defendants attempted to distinguish *Coscia*, arguing "[b]ecause they were engaged in manual trading, … their trades—unlike Coscia's—were actually tradeable due to the length of time they remained active prior to cancellation." *Id.* That reasoning was unpersuasive, and we affirmed the convictions in *Chanu*. In *Coscia*, we had "rejected Coscia's defense that he 'placed real orders that were exactly that, orders that were tradeable'—the same defense Chanu and Vorley now employ." *Id.* (quoting *Coscia*, 866 F.3d at 790, 797 (citations omitted)). Importantly, we noted "order placement signals a trader's intent to buy or sell." *Id* at 541. Thus, "[b]y obscuring their intent to cancel, through an orchestrated approach, Chanu and Vorley advanced a quintessential 'half-truth' or implied misrepresentation—the public perception of an intent to trade and a private intent to cancel in the hopes of

financial gain." *Id.* Moreover, we emphasized so long as the trading conduct "is deceitful and aligns with the plain meaning of 'scheme to defraud,'" it can be criminalized under the commodities fraud or wire fraud statute. *Id.*

The defendants had fair notice that their conduct was prohibited by the wire and commodities fraud statutes. The fraud statutes have long been held to encompass "implied representation[s]" and "misleading omission[s]." *Chanu*, 40 F.4th at 541. In particular, "[a] half truth, or what is usually the same thing as a misleading omission, is actionable as fraud … if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343, 1348 (7th Cir. 1995). And, as we held in *Chanu*, the defendants' spoofing conduct "advanced a quintessential 'half-truth' or implied misrepresentation" prohibited by the fraud statutes—namely the public perception of the intent to trade and the private intent to cancel. 40 F.4th at 541.

Pacilio and Bases advance several arguments that the statutes are vague, but none are persuasive. First, defendants submit it was not until "Coscia was indicted in October 2014, that the government first claimed that spoofing could be fraudulent." Though "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope," courts may apply a statute to novel conduct so long as the plain text permits. *Lanier*, 520 U.S. at 266.

Years before *Coscia*, this court held that placing orders in the commodities market in a way that gives a "misleading signal" can be an "active misrepresentation." *United States v. Dial*, 757 F.2d 163, 169 (7th Cir. 1985). The *Dial* defendants

were found guilty of mail and wire fraud—in violation of 18 U.S.C. §§ 1341 and 1343—stemming from the trading of silver futures on the Chicago Board of Trade. *Id.* at 164. They had "defrauded the people from whom they bought silver futures contracts … by trading, without margin," that is without cash backing, their clients' accounts. *Id.* at 169. This court ultimately decided that though defendants "owed" no duty to disclose their unmargined trading "to people on the other side of their silver futures transactions, their trading an unmargined account was an active misrepresentation," as trading without margin indicates the trades are backed by cash when they are not, imbuing the trader with "powerful influence on futures prices." *Id.*

Pacilio's and Bases's conduct is indistinguishable from that deemed illegal in other cases. By placing spoof orders they intended to cancel before execution, they sent misleading signals to the market that the demand for a given commodity was much higher, effecting an increase in the market price. Through this active misrepresentation of demand, defendants' iceberg orders would accrue significant profits when executed. Any novelty in this prosecution is based on the particulars of defendants' spoofing scheme, not any originality in construing the relevant fraud statutes. As we explained in *Coscia*, spoofing is a relatively new phenomenon aided by the development of high frequency programmed trading. 866 F.3d at 786–87. And as we have held before in *Coscia* and *Chanu*, spoofing is synonymous with other behavior actionable as fraud.

Second, defendants assert the passage of the Dodd-Frank Act's spoofing provisions signals that spoofing was not previously considered fraud. Dodd-Frank included an amendment

to "prohibited transactions" under the Commodity Exchange Act, 7 U.S.C. § 6c(a)(5)(C), recognizing spoofing as unlawful. But Congress did not create the concept of spoofing. As the Exchange Act notes, the term spoofing was "commonly known to the trade." 7 U.S.C. § 6c(a)(5)(C). Moreover, "[t]he Federal Criminal Code is replete with provisions that criminalize overlapping conduct." *Pasquantino v. United States*, 544 U.S. 349, 359 n.4 (2005). As we have just noted, the wire and commodities fraud statutes criminalized defendants' conduct before the passage of Dodd-Frank.

Third, Pacilio and Bases contend the government's description of the spoofing scheme is impermissibly broad to capture their conduct. Yet in *Coscia*, we characterized a similar scheme—although it used an algorithm rather than manual trades—as market manipulation akin to "pump and dump" schemes that the government prosecutes under the mail and wire fraud statutes. 866 F.3d at 797. The government's description is therefore consonant with this court's precedent.

Fourth, defendants urge the court to rely on the Fifth Circuit's en banc decision in *United States v. Radley*, 632 F.3d 177 (5th Cir. 2011), to hold that it is not fraud to place trades without the intent to enter into a transaction if the trades are at risk of being executed. The *Radley* defendants were charged with a conspiracy to manipulate the price of propane "by placing multiple bids … in order to trick other market participants into believing that demand for the commodity was strong and came from more than one source" and "placed bids at prices higher than other bidders had posted, allegedly perpetrating their deception by enticing other market participants to transact at higher prices." *Id.* at 180. The district court had previously ruled that "even if [the bids] were higher than any

others, [they] were actually bids, and when they were accepted, defendants actually went through with the transactions." *United States v. Radley*, 659 F. Supp. 2d 803, 815 (S.D. Tex. Sep. 17, 2009). "Since defendants were willing and able to follow through on all of the bids, they were not misleading." *Id.* The Fifth Circuit affirmed the district court's dismissal of the indictment's price manipulation, cornering, and wire fraud counts. 632 F.3d at 179.

This court previously addressed *Radley* in *Coscia*. 866 F.3d at 797 n.64. We ruled that *Radley* was not analogous because that case did not involve an attempt "to create the illusion of artificial market movement that included the use of large orders to inflate the price while also taking steps to avoid transactions in the large orders." *Id.* That is the conduct (which Pacilio and Bases do not dispute) that occurred here, though through manual trades rather than a programmed algorithm. In *Coscia* and *Chanu*, this court specifically rejected this defense. *Chanu*, 40 F.4th at 540; *Coscia*, 866 F.3d at 790, 797. The defendants had sufficient notice that their spoofing scheme was prohibited by law.

### B. Sufficiency of the Evidence

The defendants also challenge whether the evidence at trial supported their convictions. Because they moved for a judgment of acquittal, we review the sufficiency of the evidence in support of the conviction de novo. *United States v. Durham*, 766 F.3d 672, 678 (7th Cir. 2014). This court "construe[s] the evidence in the light most favorable to the government, asking whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016). A conviction will be overturned "only if, after reviewing the

record in this light, we determine that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *United States v. Fitzpatrick*, 32 F.4th 644, 649 (7th Cir. 2022) (internal quotation marks omitted). The burden to overturn a conviction on sufficiency of the evidence "is a high one," one this court has "described as 'nearly insurmountable.'" *Id.* (quoting *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021)).

The government establishes a conspiracy by proving that "(1) two or more people agreed to commit an unlawful act, and (2) the defendant on trial knowingly and intentionally joined in the agreement." *See United States v. Griffin*, 76 F.4th 724, 742 (7th Cir. 2023) (holding that sufficient evidence supported two defendants' convictions under 18 U.S.C. § 1349) (citation omitted).[1] Title 18 U.S.C. § 1343 criminalizes the use of wire, radio, or television communications to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses … . To convict a defendant of wire fraud, the government must prove three elements: (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme." *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009). The statute reaches "not only false statements of fact but also misleading half-truths and knowingly false promises." *Weimert*, 819 F.3d at 355. Actionable misstatements can also "include

---

[1] Though the fraud scheme in this case concerned commodities trading—whereas the fraud in *Griffin* involved a scheme to fraudulently obtain Small Business Administration loans, 76 F.4th at 733–34—both cases dealt with allegations of wire fraud and conspiracy to commit such under 18 U.S.C. §§ 1343 and 1349.

the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim." *Id.* Clarifying the statutory term "scheme or artifice to defraud," the Supreme Court has held that materiality of falsehood is an element of the federal wire fraud statute. *Neder v. United States*, 527 U.S. 1, 25 (1999).

1. *Sufficient evidence supports the defendants' convictions for conspiracy to commit wire fraud.*

Lakhan testified how he, Pacilio, and Bases carried out the spoofing scheme by placing orders they intended to cancel for the sole purpose of "manipulat[ing] the price to the level you wanted it," admitted that spoofing placed "false information" into the market "as to demand, supply," and "intent" to trade, and stated defendants both placed spoof orders "frequently" in the precious metals futures market. The government also submitted evidence of numerous trades where defendants placed an iceberg order followed by a visible spoof order which was cancelled immediately after executing the iceberg order. The evidence further included contemporaneous chat messages between the defendants, Lakhan, and others discussing their actions in placing "spoof" orders "not intended to be executed" in order to "push," "move," and "goose … up" the market price of commodities.

The defendants do not contest any of this evidence. Rather, they argue their wire fraud convictions should be reversed because CME orders do not implicitly represent that a trader wants to trade. This argument is predicated on language in the operative third superseding indictment. That states the fraudulent orders placed by defendants were

"material misrepresentations that falsely and fraudulently represented to market participants that [defendants] and others actually *wanted* to trade the Fraudulent Orders when, in fact, they did not *want* to do so." To the defendants, because CME orders only impliedly represent that traders are willing to trade—not that they actually want to trade—the government did not prove the fraudulent misrepresentation in the indictment necessary for a wire fraud conviction.

The terms "intend," "intending," and "intent" are used throughout the indictment, including in the crucial paragraph setting forth the elements for conspiracy to commit wire fraud. But in one instance in paragraph 12, the term "want" is used in the "Manner and Means" section of the conspiracy. The other sixteen paragraphs of that section do not use "want."

The jury was instructed that convictions for wire fraud required that the defendants intended to not trade the spoof orders. In the instructions "scheme to defraud" meant "a scheme that is *intended* to deceive or cheat another and to obtain money or property or to cause the potential loss of money or property of another by means of materially false or fraudulent pretenses, representation, or promises." (emphasis supplied) "[I]ntent to defraud" was defined as acting "knowingly with the intent to deceive or cheat in order to cause a gain of money or property to the defendant or another or the potential loss of money or property to another." The question for the jury was whether the defendants had fraudulent intent. The evidence was sufficient for a rational jury to find that intent beyond a reasonable doubt.

Whether the trade orders showed a willingness or desire to trade does not matter. In *Chanu*, we held that placing an

order on the CME represented an intent to buy and sell. 40
F.4th at 540–42. In addition, the ubiquitous use of "intent" lan-
guage throughout the indictment and the jury instructions
cured any error created by the word "want" in one paragraph.
One word in one paragraph of the 16-page indictment does
not warrant reversal.

   2.  *Sufficient evidence supports Pacilio's conviction for
       commodities fraud.*

Pacilio also contends the government presented no evi-
dence of his fraudulent intent in 2014 to substantiate his con-
viction for commodities fraud. This challenge fares no better.
Title 18 U.S.C. § 1348(1) criminalizes conduct "to defraud any
person in connection with a commodity for future delivery."
To convict a defendant on commodities fraud, the govern-
ment must prove (1) fraudulent intent, (2) a scheme or artifice
to defraud, and (3) a nexus with a security. *Coscia*, 866 F.3d at
796 (citation omitted). "False representations or material
omissions are not required" for a conviction under this stat-
ute. *Id.* "Because [Pacilio] focuses on intent, this makes [the
court's] job relatively easy." *United States v. Johnson*, 874 F.3d
990, 1000 (7th Cir. 2017) (internal quotation marks omitted).
"[O]nce a jury has weighed the evidence and has found guilt
beyond a reasonable doubt," a challenge to the sufficiency of
the evidence proving intent "is exceedingly difficult to win."
*United States v. Dingle*, 862 F.3d 607, 614 (7th Cir. 2017).

The jury could find Pacilio intended to defraud based on
the government's data evidence depicting the spoofing
scheme, Lakhan's testimony, and prior evidence of Pacilio's
intent to commit wire fraud. Lakhan testified he witnessed
Pacilio make the exact same types of spoofing trades at Mor-
gan Stanley that he made at Bank of America during the time

frame covered by the wired fraud convictions, where chats and emails provided clear evidence of Pacilio's intent. Pacilio notes, and we agree, that Lakhan did not testify to Pacilio's intent in the later time frame covering the commodities fraud. But direct evidence of intent is often unattainable, and "specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Pust*, 798 F.3d 597, 600–01 (7th Cir. 2015) (internal quotation marks omitted).

Pacilio argues "[a] jury may not infer that because a defendant committed an illegal act once, he must have also committed another alleged similar act." For this he relies on *United States v. Manganellis*, 864 F.2d 528, 531 (7th Cir. 1988)). But unlike the prior intent evidence here, *Manganellis* concerned the admission of prior bad acts, *id.*, so it is inapplicable. The government's prior intent evidence is not prior bad acts evidence. It is circumstantial evidence the jury could have relied upon to find that Pacilio maintained his fraudulent intent when continuing to trade in the exact same way at a later time period.

We afford the district court great deference on this type of challenge. A reasonable jury could find beyond a reasonable doubt, based on all the prior evidence of Pacilio's intent, coupled with the government's data and Lakhan's testimony, that Pacilio continued to trade at Morgan Stanley with the same fraudulent intent he possessed at Bank of America. Sufficient evidence supported Pacilio's conviction for commodities fraud.

### C. The District Court's Evidentiary Rulings

Bases asks for a new trial, arguing the district court erred in (1) admitting testimony from CME representatives and bank officials, and (2) excluding evidence of his good faith.

We review evidentiary rulings for an abuse of discretion. *United States v. Pulliam*, 973 F.3d 775, 782 (7th Cir. 2020). "Reversal is warranted only where the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014) (internal quotation marks omitted). An evidentiary error requires reversal if the error was not "harmless." *United States v. Chaparro*, 956 F.3d 462, 481–82 (7th Cir. 2020). "The general test for harmless error at trial is whether it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* at 482 (quoting *United States v. Bonin*, 932 F.3d 523, 538 (7th Cir. 2019)).

> 1. *The district court properly admitted testimony of CME representatives and bank officials.*

Bases asserts the district court abused its discretion by admitting testimony from CME representatives and bank officials because their testimony was irrelevant and more prejudicial than probative.

This testimony was relevant. The district court admitted the testimony of CME representatives Robert Sniegowski and John Scheerer, who testified as lay persons to their understanding of CME Rule 432 and its prohibition of defendants' conduct. Sniegowski testified that Rule 432's prohibition of "manipulation of prices," "bad faith," and "conduct … inconsistent with just and equitable principles of trade" prohibited entering an order that the trader intends to cancel, i.e.,

spoofing. He also testified the CME requires traders to place only those orders that they "desire to actually buy or sell" and expects market participants to know the rules to ensure market integrity. Scheerer likewise testified CME rules prohibited traders from "placing orders with the intent to cancel before execution."

This testimony was relevant because defendants knew of the CME rules. Several commodities futures traders testified that they were on notice of and understood CME rules requiring that orders be bona fide and prohibiting the placement of orders with the intent to cancel them. The testimony was also relevant to demonstrate the defendants' intent to manipulate the market by placing orders with the intent to cancel, contrary to the expectation of market participants.

The district court also admitted the testimony of John Juul and Ed McLaren, compliance officers at Deutsche Bank and Bank of America, respectively. They testified their financial institutions prohibit the placing of orders with intent to cancel. The defendants contend this testimony is irrelevant because "there was no evidence that anyone at the banks ever shared with [the defendants] that general prohibitions against 'manipulation' were interpreted or understood to encompass spoofing." Both testified, though they worked in separate departments from defendants, that they functioned together as "one compliance department" and that traders at their banks were expected to understand and follow bank policies. Those included policies prohibiting market manipulation, such as spoofing. Further, the evidence showed that defendants knew of, and received training on, the banks' compliance policies, much like they knew of and received training on the CME Rules.

The defendants submit this testimony's probative value was outweighed by the danger of unfair prejudice, *see* FED. R. EVID. 403, because the testimony discussed market "manipulation," which is a distinct offense not charged. "The balancing of probative value and prejudice is a highly discretionary assessment, and [the court] accord[s] the district court's decision great deference, only disturbing it if no reasonable person could agree with the ruling." *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003). The defendants provide no rationale to reverse the district court's decision. The government expressly defined for the jury what it meant by "manipulate."

> Ladies and gentlemen, good morning. You have before you two bankers. These two bankers manipulated the market prices of gold and silver. They pushed those prices up and they pushed those prices down with orders to buy and sell, orders that they knew sent fake signals to the market about supply and demand.

The jury would not have confused "manipulate" with "market manipulation" because the terms are distinct. "Manipulate" is a generally understood term distinct from a statutory term like "market manipulation." The defendants were not convicted for manipulation, but for fraud. *See United States v. Bloom*, 846 F.3d 243, 252 (7th Cir. 2017) (holding sufficient evidence existed of defendants manipulating investment portfolio yield rates to support convictions for wire and investment adviser fraud). And, as discussed previously, the district court sufficiently instructed the jury on the meaning of "scheme to defraud."

Bases relies heavily on *United States v. Farinella*, 558 F.3d 695 (7th Cir. 2009), in support of his claim of error in admitting this testimony. That case concerned whether sufficient evidence supported Farinella's conviction for misbranding food with intent to defraud or mislead in violation of 21 U.S.C. §§ 331, 333. *Id.* at 697. The government presented the testimony of an FDA employee. *Id.* at 699. He testified he searched through an FDA database detailing inquiries regarding the labeling of food products and found no record of inquiry from Farinella requesting a change to the "best when purchased by" date on their product. *Id.* "The implication was that changing the 'best when purchased by' date on a label requires the FDA's permission, and he added that the FDA requires supporting data before approving a request to change the date." *Id.*

This court ruled the district court should not have admitted that testimony. *Id.* at 699–700. Most salient was the fact that, if such a requirement could predicate a criminal conviction, the requirement should be included "in some written interpretive guideline or opinion, and not just in the oral testimony of an agency employee." *Id.* at 699. The court noted, "[i]t is a denial of due process of law to convict a person of a crime because he violated some bureaucrat's secret understanding of the law." *Id.* That testimony discarded, the evidence was insufficient to support Farinella's conviction. *Id.* at 700.

Here, Bases asserts that, like in *Farinella*, the testimony from CME representatives and bank officials constitutes "some bureaucrat's secret understanding of the law" and should have been prohibited. *Id.* at 699. But *Farinella* is easily distinguishable. There, to prove misbranding and fraud, the

government needed to establish that FDA approval was required before changing a label. In contrast, Rule 432 was not a predicate for criminal liability here. Indeed, the district court instructed the jury, "[e]vidence that a defendant … violated an exchange rule or any bank policy is not sufficient, in and of itself, to find a defendant guilty of conspiracy to commit wire fraud, wire fraud, or commodities fraud." The instruction made clear the CME rule could not be the basis of criminal liability and cured any potential confusion by the jury.

Even if the testimony from the CME representatives and bank officials was erroneously admitted, such an error was harmless. This testimony went to the defendants' state of mind: they intended to manipulate the market by placing spoof orders with the intent to cancel that traders would perceive as bona fide. Abundant evidence at trial supported a finding of fraudulent intent, including: defendants' chat messages; the testimony of Lakhan and others that CME rules prohibit traders from placing orders with the intent to cancel; and other witnesses' testimony that spoof orders sent misleading signals to the market, irrespective of Rule 432 or bank policies. Admitting the testimony of the CME representatives and bank officials was not an abuse of discretion.

> 2. *The district court correctly excluded evidence of Bases's good faith.*

A key question at trial was whether Bases knew his conduct was prohibited. He argues the exclusion of certain evidence of his good faith was an abuse of discretion. Specifically, he faults the exclusion of certain chat messages between him and Bank of America colleague Simon Butler. Because the sequence of these messages is important to our analysis, a history of their exchange is below.

Bases and his colleagues received an email from their Bank of America supervisor, Rupen Tanna, on July 22, 2013, informing them that the British regulatory authorities had fined Coscia and noting that his behavior is "deemed unacceptable." The *following* day, Bases and Butler engaged in the following exchange:

> [Bases]: **Did u read that thing that Rupen sent out?**
>
> …
>
> [Bases]: Everyone has done it
>
> …
>
> [Bases]: **Offered it or bid it to do the opposite**
>
> [Bases]: The problem is
>
> [Bases]: Both orders were good
>
> [Butler]: it is however t[he] same as any algo based strategy
>
> [Bases]: U could have traded either side
>
> [Bases]: **And that's illegal?**
>
> …
>
> [Bases]: They were real orders

The government sought to exclude the evidence as hearsay that fell outside the scope of the state-of-mind exception under Federal Rule of Evidence 803(3). The district court agreed and excluded all the messages except for those bolded above.

Exempt from the prohibition of hearsay are "statement[s] of the declarant's then-existing state of mind … or emotional,

sensory, or physical condition …, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." FED. R. EVID. 803(3). Statements are admissible under the state-of-mind exception only when the following three requirements are met: "(1) the statement[s] must be contemporaneous with the mental state sought to be proven; (2) it must be shown that declarant had no time to reflect, that is, no time to fabricate or misrepresent his thoughts; and (3) the declarant's state of mind must be relevant to an issue in the case." *United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir. 1992).

The district court properly excluded Bases's statements. None of these messages were made contemporaneously with the execution of the orders they reference. Rather, Bases sent these messages to Butler the day after receiving the Rupen Tanna email, showing that Bases had ample time to reflect on the email and misrepresent his thoughts to Butler.

Bases argues these statements were contemporaneous to his learning of the event to which he was reacting, namely the enforcement action against Coscia, and not prior trades. Even assuming the messages were not made in reference to prior trades, Bases still has a contemporaneity problem. He was not reaching out to Butler as the Tanna email came through. Certainly, some of the statements are contemporaneous reactions to Butler's questions. But other statements are likely thoughts Bases formulated following the arrival of the Tanna email the previous day. As such, Bases's messages were properly excluded as hearsay, and the district court did not abuse its discretion.

Even if the messages were improperly excluded, any error was harmless. The district court permitted Bases to introduce

ample evidence addressing whether he had knowledge that his conduct was prohibited. This evidence included: Tanna's email about Coscia; Bases's reference to that email in the chat messages the next day; Bases's contextual statement, "offered it or bid it to do the opposite;" and Bases's questions, "And that's illegal?" During closing argument, Bases's counsel relied on this admitted evidence to argue Bases's belief "that his trading was lawful." As the government points out, Bases was able to introduce evidence on the very question he claims he was precluded from addressing. Therefore, the exclusion of other statements relevant to Bases's good faith did not show beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. The district court acted within its discretion.

### III. Conclusion

For these reasons, we AFFIRM the judgments of the district court.